STATE of Utah, Plaintiff and Respondent,

v.

Kipp PHILLIPS et al., Defendants and Appellants.

No. 13816.

Supreme Court of Utah.

Sept. 15, 1975.

1. Section 31-41-13, U.C.A.1953 (Replacement Vol. 4A).

2. Utah Constitution, Article VIII Sec. 9.

Brian R. Florence, of Florence & Hutchison, Ogden, for defendants and appellants.

Vernon B. Romney, Atty. Gen., David L. Wilkinson, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

CROCKETT, Justice:

Each of the three named defendants was convicted by the Ogden City Court of distributing pornographic materials from the Adult Book and Cinema Store in Ogden, in violation of Section 76–10–1204, U.C.A. 1953. On appeal to the district court, their

convictions were affirmed; and because of the constitutional issue, they appeal to this court.[1]

Defendants have made no contention that the materials were not pornographic, but concede that fact. Their defense is that our statutes are unconstitutional. Pornographic material as proscribed in the section referred to is defined in the preceding section, 76–10–1203, U.C.A.1953:

(1) Any material or performance is pornographic, if, considered as a whole, applying contemporary community standards:

(a) Its predominant appeal is to prurient interests; *and*

(b) It goes substantially beyond customary limits of candor in the description or representation of nudity, sex, or excretion.

(2) In any prosecution dealing with an offense relating to pornographic material or performances, the question whether the predominant appeal of material or of a performance is to prurient interest shall be determined with reference to average adults.

\* \* \* \* \* \*

■ The primary basis of defendants' attack upon this statute is that it is in conflict with the First Amendment of the United States Constitution:

*Congress shall make no law* respecting an establishment of religion, or prohibiting the free exercise thereof; or *abridging the freedom of speech, or of the press*; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The rule which should be applied is that laws, and especially foundational laws such as our Constitution, should be interpreted and applied according to the plain import of their language as it would be understood by persons of ordinary intelligence and experience. Viewed in that light it is submitted that this provision is simply, solely, expressly and utterly, nothing more and nothing less than a limitation upon the Congress of the United States and the powers of the federal government.

This is made abundantly clear by the other amendments adopted at the same time.

Amendment IX:

The enumeration in the Constitution, *of certain rights, shall not be construed to deny or disparage others retained by the people.*

Amendment X:

*The powers not delegated to the United States by the Constitution,* nor prohibited by it to the States, *are reserved to the States*, respectively, *or the people.*

The reasonable and judicious approach to the application of these amendment requires that they be considered together, and in the light of the background and purposes for which they were adopted, and this applies with equal force and appropriateness to the Fourteenth Amendment, which has been used to distort and nullify, in some measure, the purposes of the First Ten Amendments. The latter arose out of political and religious strife and oppressions; and that was what they were intended to remedy. In our judgment it is an egregious error to take such declarations out of their background and their clearly expressed intent and extend them into unintended areas across the whole spectrum of human conduct. What the claimed "right" to spew the filth of pornographic and obscene materials on one's fellowmen has to do with political and religious liberty is difficult to perceive.

The foregoing is said in awareness of the proliferations that have occurred on the First Ten Amendments, and particularly by the use of the Fourteenth Amendment, to extend and engraft upon the sovereign states, limitations intended only for the federal government.[2] This has result-

---

1. As permitted by Utah Constitution, Art. VIII, Sec. 9.

2. That the United States Supreme Court has itself previously held that the Fourteenth

ed in a constant and seemingly endless process of arrogating to the federal government more and more of the powers, not only not granted to it, but expressly forbidden to it, and in disparagement of the powers properly belonging to the sovereign states and the people. This development is a clear vindiction of the forebodings of the founding fathers and their fears of centralization of power. This was but natural because of the conditions out of which our form of government came into being and because history is strewn with other examples which demonstrate that undue, uncontrolled and unwieldy concentrations of power in any individual or institution tends to destroy itself. It is our opinion that this is the evil which the founders feared so keenly and tried so zealously to guard against, but which is now rife upon us. It is plainly evident that it was their desire and purpose to avoid this by providing for what they believed to be an essential and desirable balance of power between the sovereignties of the states and of the federal government.

What we have just said is with the utmost respect, and indeed devotion, to our system of government. This includes devotion to the founders' concept of a sovereign nation consisting of sovereign states, with the respective sovereignties so interrelated that their sovereign powers check and balance each other; which we think it is of the utmost importance to respect and maintain. Consequently, we feel impelled to voice our disagreement with the almost unbelievable arrogation of power by and to the federal government and its judiciary in which the defendants seek protection of the sale of materials of the character here involved. This thinking is represented, at

least in some measure, by Chief Justice Burger in his statement in the recent decision of *Miller v. California*,[3] with which we heartily agree and commend: "That such conduct must be specifically defined by the applicable state law, as written or authoritatively construed . . ." and further ". . . we emphasize that *it is not our function to propose regulatory schemes for the States*." [All emphasis in this opinion is ours.]

Having made our statement concerning the defendants' contentions in regard to the federal constitution, we turn to what we regard as the pertinent issue here under the constitution of our own state, Article I, Section 1 of the Utah constitution, that "all men have the inherent and inalienable right . . . to communicate freely their thoughts and opinions . . .." Consistent with that provision, and notwithstanding what else has been said herein, we have no desire to disparage the idea that every person should have the highest possible degree of freedom of thought, expression and action consistent with respecting similar rights in other individuals and the welfare of society generally.

Despite salutary constitutional guarantees of rights and liberties, with which we are in unreserved accord, advocacy of any of them as absolute fails to take into account the interdependency of rights and restraints necessary in an organized society. The courts seem to have no difficulty in recognizing that, though we are assured protections in the rights of life and liberty, and in persons and property, even those basic rights are limited when they infringe upon the reciprocal rights of other individ-

Amendment does not make the First Ten Amendments applicable to the states see *Twining v. N. J.*, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97; *Presser v. Ill.*, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615; *Walker v. Sauvinet*, 92 U.S. 90, 23 L.Ed. 678.

3. 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419. In that case and a number of similar cases decided at the same time the United States

Supreme Court set forth advisory guidelines; See *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446; *Kaplan v. California*, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492; *United States v. 12 200 Ft. Reels*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500, and *United States v. Orito*, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513, all decided June 21, 1973, as was *Miller*.

uals, or when they are superseded by higher necessities for the peace, good order and welfare of the public. E. g., even the most fundamental, the right to life, has its limitations in the event of war, or other exigent circumstances. Similarly, the rights of personal action, or use of property, are limited when the exercise thereof infringes upon the rights or safety of other individuals or of the public.

■ It should be realized that a wholesome moral atmosphere is just as important to the general health and welfare as are the protections of persons and property; and that this requires protection of normal sensibilities and the human psyche, particularly in the young, from scarring or injury by the harmful and wrongful conduct of others. It is for these reasons that we think the position is wholly untenable that freedom of speech is any more absolute than any of the other basic freedoms. It is necessarily subject to similar limitations and controls; and this includes reasonable and proper restraints upon the publication and dissemination of pornography and obscenity.[4] That is the purpose of the statutes under attack.

■ It is to be acknowledged that because the subject is the intangible one of thought and expression, difficulty is encountered in drafting statutes with precision and definiteness. It is especially difficult to satisfy those whose desire and purpose is to flout and defy the law. It is usually in such circumstances that problems arise where lucre lures men to engage in conduct which tends to undermine and destroy the moral fibre of their fellowmen and the fabric of society to which they cry for protection of their liberties to carry on their nefarious trade. But fortunately the law makes no such demand. What it does require is that a statute be sufficiently clear that persons of ordinary intelligence, who desire to know what the law is and to abide by it, can understand what is required of them.[5]

■ In determining whether that test is met the courts should take into consideration the difficulties involved in attempting precise description of antisocial conduct of the nature here in question; and should view the statute in the light of its total context and purpose as applied to the offense being dealt with. This, the same as all legislative acts, should be given the presumption of constitutionality and should not be declared unconstitutional for vagueness unless it appears beyond a reasonable doubt that it is so unclear and unfair that it would be an imposition upon law abiding citizens.[6]

■ Also important to be considered as pertaining to the problem in this case, is the principle that no one should be entitled to challenge a statute and have it declared void because it may unjustly affect someone else,[7] but could properly do so only if his own rights are adversely affected. The exhibits in evidence are of such a nature that, to put it mildly, no one with even the barest modicum of a sense of decency, would regard as being anything other than the rawest of obscenities. In view of the fact that the defendants do not deny this, they could be in no way adversely affected by the twilight zones if any such did exist in this statute.

■ We revert to our Utah law in the light of what has been said above. It requires a unanimous finding by a jury, or by the court, beyond a reasonable doubt that the material's "predominant appeal is to prurient interests" and that it goes "sub-

---

4. *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); and cases cited in footnote 3.

5. See *State v. Packard*, 122 Utah 369, 250 P.2d 561.

6. See *Newcomb v. Ogden City Public School*, 121 Utah 503, 243 P.2d 941.

7. See *Greaves v. State* (Utah 1974), 528 P.2d 805; *Walgreen Co. v. State Board of Equalization*, 70 Wyo. 193, 246 P.2d 767; 16 Am. Jur.2d, Constitutional Law, Sec. 119; but also cf. *Lewis v. New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974).

stantially beyond customary limits of candor in the description or representation of nudity, sex, or excretion"; and that this be determined by "applying contemporary community standards." It is our judgment that that statute is sufficiently specific and meaningful to meet the requirement stated above: that persons with an ordinary sense of decency and morality, desiring to know what the law is and abide by it, would have no difficulty in understanding what transgresses those requirements; and particularly, that these defendants would have no difficulty in understanding that the exhibits in this case are within that prohibition. Our conclusion herein is in harmony with and finds support in the decisions of the courts of last resort in a number of our sister states with statutes practically the same as our own.[8]

For the reasons stated herein, it is our opinion that the statutes under attack are sufficiently clear with respect to the offense for which the defendants were charged and convicted that we are not persuaded to disagree with the judgment of the trial court in refusing to rule that the statute is unconstitutional and reverse these convictions. Accordingly, they are affirmed. No costs awarded.

HENRIOD, C. J., concurs in the result.

ELLETT, Justice (concurring and commenting on dissenting opinion).

I concur with the main opinion, but wish to comment on some statements in the dissenting opinion filed herein.

The author of the dissenting opinion makes the same mistake the federal courts made in failing to understand the meaning of the phrase *due process of law*.

Due process of law has been defined since the days of Lord Coke, who consid-

ered it as equivalent to the phrase "law of the land" (used in Magna Carta), and is said by him to denote indictment or presentment of good and lawful men.[1]

Mr. Webster's explanation in his argument in the Dartmouth College case[2] is classical:

By the law of the land is most clearly intended the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society.

Judge Cooley (Const.Lim. 441) as quoted in Bouvier's Law Dictionary, says:

Due process of law in each particular case means such an exercise of the powers of the government as the settled maxims of law permit and sanction, and under such safeguards for the protection of the individual 'rights as those maxims prescribe for the class of cases to which the one in question belongs.

Miller Constitution, page 664 says:

Law, in its regular course of administration, through the courts of law, is due process of law, and, when it is secured by the law of the State, the requirements of the Fourteenth Amendment are satisfied. Due process of law, within the meaning of that amendment, is secured, if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government.

The dissenting opinion asserts that "The Fourteenth Amendment is a part of the Constitution of the United States." While this same assertion has been made by the United States Supreme Court, that court has never *held* that the amendment was legally adopted. I cannot believe that any

8. *People v. Enskat*, 33 Cal.App.3d 900, 109 Cal.Rptr. 433 (1973); *Slaton v. Paris Adult Theatre I*, 231 Ga. 312, 201 S.E.2d 456 (1973); *Hall v. Commonwealth ex rel. Schroering*, 505 S.W.2d 166 (Ky.1974); *People v. Heller*, 33 N.Y.2d 314, 352 N.Y.S.2d 601, 307

N.E.2d 805 (1973); *Price v. Commonwealth*, 214 Va. 490, 201 S.E.2d 798 (1974).

1. Co.2d Inst. 50.

2. 4 Wheat. 518, 581, 4 L.Ed. 629.

court, in full possession of its faculties, could honestly hold that the amendment was properly approved and adopted.[3]

But even if it be assumed that Congress, by joint resolution, could compel the then Secretary of State to declare that the amendment had been approved by three fourths of the states of the Union, still there is no question in this case of lack of due process of law. The defendants were tried in a court of competent jurisdiction under rules of state law which applied to all alike. They were given notice of the charge against them and had a fair trial wherein they were afforded the rights to counsel, to be confronted by the witnesses, to testify and to give evidence in their own behalf.

In the case of *Davidson v. New Orleans* [4] it was stated:

But however this may be, or under whatever other clause of the Federal Constitution we may review the case, it is not possible to hold that a party has, without due process of law, been deprived of his property, when, as regards the issue affecting it, he has, *by the laws of the State,* a fair trial in a court of justice, according to the modes of proceeding applicable to such a case. This was clearly stated by this court, speaking by the Chief Justice, in *Kennard v. Morgan* (92 U.S. 480, 23 L.Ed. 478), and, in substance, repeated at the present term, in *McMillan v. Anderson* (95 id. 37) [23 L.Ed. 335]. [Emphasis added.]

In *Hurtado v. California*, 110 U.S. 516, at 535, 4 S.Ct. 111, at 120, 28 L.Ed. 232 (1884), it was held:

. . . Due process of law in the latter [Fifth Amendment] refers to that law of the land which derives its authority from the legislative powers conferred upon congress by the constitution of the United States, exercised within the limits therein prescribed, and interpreted according to the principles of the common law. In the fourteenth amendment, by parity of reason, it refers to that law of the land in each state which derives its authority from the inherent and reserved powers of the state, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and the greatest security for which resides in the right of the people to make their own laws, and alter them at their pleasure.

In *Missouri v. Lewis* [5] it was held:

The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line.

The term *due process of law* does not mean freedom of speech; the right to speedy trial, and the other rights protected from the Federal entity by the first eight amendments to the Constitution. If due process of law did mean that the Federal entity could not abrogate those rights, then it was not necessary to enumerate them, for the Fifth Amendment clearly states: "No person shall . . . be deprived of life, liberty, or property, without due process of law; . . ."

The Fourteenth Amendment uses the similar language: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; . . ." If it could be held that the Fourteenth Amendment was validly adopted, then it would only place the burden upon the states to afford that due process of law which the Fifth Amendment imposes upon the Federal entity, and that is something wholly apart from the particular

---

3. See *Dyett v. Turner*, 20 Utah 2d 403, 439 P.2d 266 (1967).

4. 96 U.S. 97, 105, 24 L.Ed. 616 (1877).

5. 101 U.S. 22, at 31, 25 L.Ed. 989 (1879).

rights mentioned in the first eight amendments.

Under no stretch of the imagination can it be said that the Federal courts can impose new laws or change the old ones under the guise of *due process of law*.[6]

There has been no denial of due process of law in this case. The defendants have had a fair trial under a statute which is clear and unambiguous. The judgment of conviction should be affirmed.

MAUGHAN, Justice (dissenting).

In registering my dissent, I do so for the following reasons:

1. The contention is made that the Fourteenth Amendment to the Constitution of the United States is limited in its application to political and religious controversy. To acknowledge the Fourteenth Amendment for such narrow purposes, and deny it as to all others is, in my view, a strange and unsupportable position—in the law.

The failure to follow the constitutional limitations upon restrictions of First Amendment rights, as specifically set out in *Miller v. California*.[1] Thus denying the Supreme Court of the United States its duty to interpret the Federal Constitution.

3. The failure to address the due process question, which is the sine qua non of this appeal.

It is important to know what the Fourteenth Amendment is:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The initial sentence of this section makes national citizenship primary and State citizenship derivative. Thus we are entitled to a dual citizenship; that arising from our status as citizens of the United States and that arising from our status as citizens of Utah. As such we are entitled to all the rights, privileges and immunities made available to us in both of the fundamental documents; and the due process of law available to us as citizens of the United States is identical to that due process of law made available to us by our State Constitution, which in Article I, Section 7, provides:

> No person shall be deprived of life, liberty or property, without due process of law.

The history of the Fourteenth Amendment leaves little doubt that the intention of the framers of the clause was to convert all the ordinary rights of citizenship in a free government into rights of national citizenship, and thus, in effect, to accommodate their regulation by the national government. Thus the Fourteenth Amendment can protect the citizens against the State itself, and all of its agencies.

The Constitution of the State of Utah, Article I, Section 3, says:

> The State of Utah is an inseparable part of the Federal Union and the Constitution of the United States is the supreme law of the land.

The Fourteenth Amendment is a part of the Constitution of the United States; it is directed specifically to the States, and thus prevents any State from making or enforcing "any law which shall abridge the privileges or immunities of citizens of the United States"; and from depriving "any person of life, liberty, or property, without due process of law; . . ." It thus brings to bear upon the States all those rights, privileges and immunities, which are an inalienable part of citizenship. One of these inalienable rights is the right to

---

**6.** Save by the spurious and false statements of the Federal Supreme Court itself.

**1.** 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

due process of law. If a State law does not accord due process of law, a citizen is not without remedy, nor is any person within the State's jurisdiction. A test of what rights, privileges, and immunities are impressed upon the States through the Fourteenth Amendment was succinctly stated in *Twining v. New Jersey*[2] one of a long line of cases in the maturation process of that amendment; see also *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932); the concurring opinion of Mr. Justice Goldberg in *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

Is it a fundamental principle of liberty and justice which inheres in the very idea of free government and is the inalienable right of a citizen of such a government? If it is, and if it is of a nature that pertains to process of law, this court has declared it to be essential to due process of law.

These principles have been in operation for a long time, have been applied by the state courts, as well as the federal courts; and, it may be added, for the benefit of the country and its citizens. For a brief review see 16 Am.Jur.2d, Constitutional Law, Section 335. Thus, it can be seen that those fundamental principles of liberty and justice contained in the first ten amendments of the Constitution of the United States are made applicable to the States through the Fourteenth Amendment.

This court today states that the first ten amendments to the Constitution of the United States are solely limitations on the Congress and the federal government. This statement would seem unnecessary, for such is well known in the law, and elsewhere. Such was the law upon their adoption and such is the law now, but from what has been said above it can be seen that those fundamental freedoms contained in the federal bill of rights are impressed upon the States through the Fourteenth Amendment.

This court states there is an "almost unbelievable arrogation of power by and to the federal government and its judiciary," and goes on to say that "this thinking is represented, at least in some measure, by Chief Justice Burger in his statement in the recent decision of *Miller v. California*, with which we heartily agree and commend: 'That such conduct must be specifically defined by the applicable state law, as written or authoritatively construed' . . . and further '. . . we emphasize that it is not our function to propose regulatory schemes for the States.' " The next sentence, viz., *"That must await their concrete legislative efforts."*, was deleted in the main opinion. How this shows that the Chief Justice joins in the thought that there has been an "almost unbelievable arrogation of power by and to the federal government and its judiciary," is hard to tell. The main opinion says that this court heartily agrees with and commends the Chief Justice's statement that the prohibited conduct must be specifically defined by the applicable state law as written or authoritatively construed. Yet the statute on appeal does not specifically define the prohibited conduct, nor does the main opinion.

With reference to the appellants' right to challenge the statute, it is stated that they are not entitled to do so because their own rights are not adversely affected.[3] They

2. 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908).

3. See *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), wherein it was held: It has long been recognized that the First Amendment needs breathing space and that the statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society. [citations omitted.] As a corollary, the Court has altered its traditional rules of standing to permit—in the First Amendment area— "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the

have been arrested and convicted, the outcome of this appeal will determine whether the statute has an adverse effect upon them. To gloss over that with a general condemnation is tantamount to saying you are guilty, therefore you are not entitled to due process. It seems clear to me that due process of law is that method we employ to determine whether one is guilty under our law. This court misses the point on appeal, viz.: Does the statute define the crime with appropriate definiteness?

With the foregoing background I can now proceed to the salient question presented on appeal, viz.: Can these defendants be convicted under a statute restricting First Amendment freedoms, which they claim to be vague, indefinite, and overbroad in its attempted description of the offense proscribed? If the subject statute is of that character, and the conviction is allowed to stand, appellants are denied their liberty without due process of law. If the statute is of such a nature it is unconstitutional, in violation not only of the Utah Constitution, but of the Fourteenth Amendment to the Constitution of the United States.

In three separate cases defendants were convicted and sentenced for distributing pornographic material contrary to the provisions of 76–10–1204, U.C.A.1953, as amended. Upon stipulation of counsel, the cases were consolidated for decision, and an appeal taken from the city court judgments to the district court. The district court sustained the convictions. All trials were to the court.

The sole issue upon appeal to the district court was the constitutionality of 76–10–1203, and that is the sole issue presented to this court. We are not called upon to determine if the subject materials are, or are not, pornographic, although it appears they

have been reviewed on appeal. We are called upon to determine the constitutionality of the statute under which the convictions were had.

Our statute 76–10–1204 "Distributing pornographic material," sets out various ways of distributing pornographic material, which, if followed, would render one guilty of violation.

For definition we are necessarily directed to a companion statute, 76–10–1203:

Pornographic material or performance —Determination of predominant appeal to prurient interest—Expert testimony not required.

(1) Any material or performance is pornographic if, considered as a whole, applying contemporary community standards:

(a) Its predominant appeal is to prurient interest; and

(b) It goes substantially beyond customary limits of candor in the description or representation of nudity, sex, or excretion.

(2) In any prosecution dealing with an offense relating to pornographic material or performances, the question whether the predominant appeal of material or of a performance is to prurient interest shall be determined with reference to average adults.

(3) Neither the prosecution nor the defense shall be required to introduce expert witness testimony concerning the pornographic character of the material or performance which is the subject of a prosecution under this part.

Our attention is directed to *Miller v. California*.[4] In that case Mr. Chief Justice Burger, writing the majority opinion, set down standards which determine the constitutionality of criminal laws seeking to

---

requisite narrow specificity." [citation omitted.] Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause

others not before the court to refrain from constitutionally protected speech or expression.

4. Ibid.

regulate pornography. "Pornography" finds its roots in the Greek words, porne, which means harlot; and graphos, writing.

In that case the Chief Justice said:

. . . We acknowledge, however, *the inherent dangers of undertaking to regulate any form of expression.* State statutes designed to regulate obscene materials must be carefully limited. . . . As a result, we now confine the permissible scope of such regulation to works which depict or describe *sexual conduct.* That conduct must be *specifically defined by the applicable state law, as written or authoritatively construed.* A state offense must also be limited to works which, *taken as a whole, appeal to the prurient interest in sex,* which portray *sexual conduct in a patently offensive way,* and which, taken as a whole, *do not have serious literary, artistic, political, or scientific value.*

The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, . . .; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. We do not adopt as a constitutional standard the "utterly without redeeming social value" test of *Memoirs vs. Massachusetts,* 383 U.S. [413], at 419, 86 S.Ct. [975], at 977 [16 L.Ed.2d 1]; that concept has never commanded the adherence of more than three justices at one time. . . . If a state law regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary. . . .

We emphasize that it is not our function to propose regulatory schemes for the States. *That must await their concrete legislative efforts.*

\* \* \* \* \* \*

Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe *patently offensive "hard core" sexual conduct specifically defined by the regulating state law, as written or construed. We are satisfied that these specific prerequisites will provide fair notice* to a dealer in such materials that his public and commercial activities may bring prosecution. [All emphasis added.]

In *Miller* we have the first clear majority decision in some years, supporting a definite constitutional test for state criminal statutes regulating pornography. See *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446; *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492; *United States v. 12 200 Ft. Reels,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500, and *United States v. Orito,* 413 U.S. 1399, 93 S.Ct. 2674, 37 L.Ed.2d 513, all decided June 21, 1973, as was *Miller.*

We are bound to recognize the decisions of the United States Supreme Court interpreting First Amendment protections and, in this matter, to apply the *Miller* limitations to our criminal statute enacted for the regulation of pornography.[5]

Appellants attack the statute as being unconstitutionally vague, indefinite, and overbroad. A criminal statute, in order to withstand a constitutional attack, must describe proscribed conduct with clarity sufficient to inform one of the kind of conduct which can result in a criminal charge. This vitally important due process requirement has been so often stated and adhered to that we need not particularize it here.

5. *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

The words of Miller, "specifically defined by the applicable state law," are merely a restatement of that principle, which is universally applied in the United States, in relation to all criminal statutes.

A cogent statement illuminating here is:

> The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchallenged delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.[6]

The statute is overbroad in its understatement.

In applying the *Miller* test to 76–10–1203 it is clear that subsection (a) is in consonance with (a) of the *Miller* standard. It is equally clear that subsection (b), of 76–10–1203, is not in consonance with (b) of the *Miller* standard. The words *nudity, sex,* or *excretion* do not specifically define the sexual conduct sought to be regulated, nor does the statute provide that a work complained of must depict or describe sexual conduct in a patently offensive way. In addition, 76–10–1203 does not provide for a determination of "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

One of many examples of the specificity required under *Miller* can be found in 76–6–404. There the elements of the crime of theft are specifically set forth, and the conduct of a person can be measured against the unvarnished words describing those elements to determine if one is a thief. One can tell if, and when, one is a thief. Two examples of sexual conduct

*"specifically defined by the applicable state law"* can be found in the Hawaii Penal Code. Title 37, Part 2, Section 1210(7), 1972, Hawaii Session Laws, Art. 9, Part II, p. 126; and the Oregon Laws, 1971, Ch. 743, Art. 29, Sec. 255(10).

It is to be emphasized here that the subject statute treads in a delicate area. "All men have the inherent and inalienable right . . . to communicate freely their thoughts and opinions . . ."[7] While it has been held that obscene material is unprotected by the First Amendment,[8] nevertheless, caution and circumspection are mandatory guides in the construction of legislation designed to define proscribed conduct; where, in doing so, it necessarily tinkers in an area embracing an inherent and inalienable right.

Mr. Chief Justice Burger makes the point that the "conduct must be specifically defined by the applicable state law, as written or authoritatively construed." The words *written* and *construed* can only be understood as being in the past tense. As employed in *Miller,* the word *written* refers to an applicable state law *in esse,* at the time of *Miller.* No one would seriously contend that the legislature could enact an *ex post facto* law. The words *authoritatively construed* can only refer to authoritative construction *in esse* at the time of *Miller.*[9] Again, no one would seriously contend that this court could indulge in *ex post facto* construction. *Ex post facto* legislation is constitutionally impermissible; and *ex post facto* authoritative judicial construction is not only constitutionally impermissible for the same reason, but, in essence, it is also judicial legislation—an invasion of the legislative function—which again is constitutionally impermissible.[10]

---

6. 83 Harvard L.Rev. 844, note 5.

7. Constitution of Utah, Art. I, Sec. 1.

8. Miller, Ibid.

9. This is particularly true in view of the statement made by Mr. Chief Justice Burger, "Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed."

10. Constitution of Utah, Article V, Section 1: "The powers of the government of the State of Utah shall be divided into three distinct

This court, long ago, in *State v. Johnson,*[11] correctly interpreted Article V, Section 1, and the effect it has on crimes and criminal statutes. The facts were that defendant was a fellator. The court held that "infamous crime against nature" was not descriptive of fellatio. At page 26, 137 P. at page 635, the court, speaking through Mr. Chief Justice McCarty, said:

> There is no provision of the Constitution that either expressly or otherwise directs or permits the courts of this state to denounce and punish as crimes acts and omissions not made punishable by statute; hence to do what we are urged would be in violation of both the letter and the spirit of the Constitution.

And again, in *Skaggs Drug Centers, Inc. v. Ashley,*[12] this court in dealing with a Sunday closing law said, at page 42, 484 P.2d at page 726:

> However, any statute whose terms are so vague that a person of ordinary intelligence could only guess at its meaning and differ as to its application fails to meet the standard of due process.

In Skaggs, the unanimous court did not hinge the unconstitutionality of the statute upon whether it would be an imposition upon law abiding citizens—such is purely a subjective view, and not one which meets the test of due process for definiteness and clarity in describing the acts and conduct intended to be proscribed.

In this State, we have no prior authoritative judicial construction of 76–10–1203, upon which we could hinge constitutional acceptability. Yet, we are urged to *construe authoritatively* the subject statute in such a fashion as to make it acceptable to the *Miller* standard. In order to bring the statute into conformance with the *Miller* standard, we would have to rewrite it; and

this no one will seriously advance as a function of this court. As was said in *Miller,* "We emphasize that it is not our function to propose regulatory schemes for the States. That must await their *concrete legislative efforts.*" [Emphasis supplied.] A concrete legislative effort is not within the province of this court.

Contrary to the view expressed in the main opinion, "that because the subject is the intangible one of thought and expression, difficulty is encountered in drafting statutes with precision and definiteness." Our legislature recognizing the infirmities of the statute here on appeal repealed it; and enacted another (Laws of Utah 1975, Chapter 49) specifically describing the conduct to be proscribed. This "concrete legislative effort" is not unlike that engaged in by Hawaii and Oregon.

Other courts dealing with statutes similar to our own, and having made no previous authoritative construction of such statutes, and finding that such statutes were not in consonance with the limitations of *Miller,* have declared their statutes unconstitutional. See *State of Louisiana v. Shreveport News Agency, Inc.,* 287 So. 2d 464 (La.1973); *State of Iowa v. Wedelstedt,* 213 N.W.2d 652 (Iowa 1973); *Stroud v. State of Indiana,* 300 N.E.2d 100 (Ind.1973). The reasons for decision in these cases are sound.

The case of *Jenkins v. Georgia*[13] was decided one year after *Miller* and is of interest here for the reason that it illustrates the application of the *Miller* standard to a conviction under an obscenity statute. There a Georgia jury had returned a general verdict of guilty against defendant for distributing obscene material. The Georgia Supreme Court affirmed the conviction. On appeal to the United States Su-

---

departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted."

11. 44 Utah 18, 137 P. 632 (1913).

12. 26 Utah 2d 38, 484 P.2d 723 (1971).

13. 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974).

preme Court the conviction was overturned, and that court, speaking through Mr. Justice Rehnquist, held the film, *Carnal Knowledge,* to be protected by the First and Fourteenth Amendments, and further said:

> Even though questions of appeal to the "prurient interest" or of patent offensiveness are "essentially questions of fact," it would be a serious misreading of Miller to conclude that juries have unbridled discretion in determining what is "patently offensive." Not only did we there say that "the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary," [citation] but we made it plain that under that holding "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct. . . ."

I am well aware of the rule that every presumption is in favor of the constitutionality of an act of the legislature, but for reasons stated above I cannot find the ground upon which that presumption can securely rest.

It is well to note that in the court below, the liberty was taken to infuse the provisions of 76–10–1202 into 76–10–1203. 76–10–1203 deals specifically with minors, and makes a specific reference to 76–10–1206, which also is specifically concerned with minors. This is judicial legislation and not permissible. The legislature did not enact these provisions for others than minors. Further, it is not permissible because of the large difference the law acknowledges as existing between minors and adults. See *Interstate Circuit, Inc. v. Dallas,*[14] where it was said:

> We have indicated . . . that because of its strong and abiding interest in youth, a State may regulate the dissemination to juveniles of, and their access to, material objectionable as to them, but which a State clearly could not regulate as to adults.

It is clear our legislature adopted a standard for minors different from the one for adults.

For reasons herein stated, 76–10–1203 should be declared unconstitutional, and the judgment below reversed.

TUCKETT, J., concurs in the dissenting opinion of MAUGHAN, J.

---

14. 390 U.S. 676, 690, 88 S.Ct. 1298, 1306, 20 L.Ed.2d 225 (1968).