## No. 26390

### The People of the State of Colorado v. Samuel Tabron

(544 P.2d 372)

Decided January 5, 1975.

150

John P. Moore, Attorney General, John E. Bush, Deputy, Robert C. Lehnert, Assistant, for plaintiff-appellee.

Bernard D. Morley, for defendant-appellant.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

The appellant, Samuel Tabron, was convicted of promoting obscenity in violation of the Colorado Obscenity Statute, 1971 Perm. Supp., C.R.S. 1963, 40-7-102 (1) (a),[1] which incorporates the definition of "obscenity" set out in 1971 Perm. Supp., C.R.S. 1963, 40-7-101 (1) and 40-7-101 (2).[2] The primary issue on appeal is whether the Colorado statutes which define

---

[1] Now section 18-7-102 (1)(a), C.R.S. 1973.
[2] Now sections 18-7-101 (5) and 18-7-101 (8), respectively, C.R.S. 1973.

and regulate obscenity can pass constitutional muster. The First Amendment of the United States Constitution, applied to the States by the Fourteenth Amendment, and Article II, Section 10 of the Colorado Constitution, guarantee every person in Colorado the fundamental right of freedom of speech and of the press. The interpretation of the federal constitutional standards by the United States Supreme Court leaves us with no alternative but to declare the statutes in issue to be unconstituional and to reverse the appellant's conviction and dismiss the charges in this case.

On April 10, 1973, a deputy district attorney for El Paso County, accompanied by another complaining witness, viewed the film "Deep Throat" at the Las Vegas Cinema in Colorado Springs after purchasing tickets from the appellant, Tabron. The appellant was arrested the following day, pursuant to an arrest warrant issued by an El Paso County district court judge. The allegedly obscene film was never seized by the authorities. Instead, a videotape of a film with the same title, but with many dissimilarities, was obtained from the Los Angeles Police Department and admitted into evidence at the appellant's trial, with no valid foundation.[3] After a guilty verdict was returned, the lower court imposed a $1,000 fine against the appellant and sentenced him to twelve months at hard labor in the county jail.[4]

■ The Colorado statutes relating to the definition of and promotion of obscenity, in our view, fail to meet the requirements of specificity imposed upon the States by the United States Supreme Court that are necessary to fairly apprise a person that his conduct may be subject to criminal penalties. Furthermore, the statutes are unconstitutionally vague and overbroad and impose a threat and tend to chill the exercise of protected speech under both the Colorado and United States Constitutions. *U. S. Const.* amends. I and XIV; *Colo. Const.* Art. II, Sec. 10.

■ The standing of the appellant to challenge the constitutionality of these statutes cannot be disputed. In *Bolles v. People*, 189 Colo. 394, 541 P.2d 80,[5] we said:

---

[3] The appellant also challenges the admission of the videotape facsimile of the film "Deep Throat." This film was never made the subject of an adversary hearing to determine obscenity prior to trial. In view of our determination of the other issues in this case, the admissibility of the videotape need not be determined. *See Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973); *Paris Adult Theatre I v. Slaton,* 413 U.S, 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *Houston v. Manerbino,* 185 Colo. 1, 521 P.2d 166 (1974).

[4] At the trial, the jury was instructed that the community standards of El Paso County were to be used in determining whether the videotape replica of the film was obscene. Our judgment with respect to this instruction is reflected not only in the comments contained in this opinion, but also in our holding in the companion case of *People v. Tabron,* 190 Colo. 161, 544 P.2d 380. In that case, the same defendant specifically requested the trial judge to rule, prior to trial, upon the community standard which was to be applied, and the trial judge refused to make the determination.

[5] In this case, we declared the crime of harassment, as defined in Section 18-9-111 (1) (c), C.R.S. 1973, to be violative of both the First and Fourteenth Amendments to the United States Constitution and Article II, Section 10 of the Colorado Constitution.

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court. Not so, however, where, as here, we are dealing with First Amendment protections. *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830; *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600.

"In *Broadrick, supra,* the Court noted that in statutes seeking to regulate only speech or written words, claims of facial overbreadth should be entertained as an exception to the general rule. This is because 'the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes.' *Id.* at 613; *Bigelow v. Virginia, supra.''*

In a five-to-four decision in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the United States Supreme Court made its most recent attempt to alleviate the confusion engendered by the history of obscenity decisions. In *Miller*, the Court was once again "faced with the task of trying to define what may be indefinable." *See Jacobellis v. Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).[6] A concise review of the history of obscenity regulation may be helpful in achieving an understanding of the current controversy and the confusion brought about by the many conflicting decisions of the United States Supreme Court.

## I.
## COMMON LAW AND COLONIAL
## REGULATION OF OBSCENITY

The publication of obscenity was not a widely recognized or vigorously prosecuted Common Law crime. At first, the publication of obscene literature was thought to be the exclusive concern of the ecclesiastical courts,[7] and was not held to be an indictable offense until 1727.[8] The only

---

[6] We do not wish to intimate that the term "obscenity" is undefinable. We agree with the analysis of Mr. Justice Stewart to the extent that he finds obscenity to be a concept not readily lending itself to easy management, particularly in light of constitutional protections.

[7] *See The Queen v. Read*, 11 Mod. 142 (Q.B. 1707); *see also A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Commonwealth of Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (Douglas, J., concurring); *Technical Report of the Commission on Obscenity and Pornography*, 66-67 (1970).

[8] *See Dominus Rex v. Curl*, 2 Strange 789 (K.B. 1727); *see also Technical Report of the Commission on Obscenity and Pornography*, 68-70 (1970); *Memoirs, supra* (Douglas, J., concurring).

obscenity case reported in the seventeenth century was that of *The King v. Sir Charles Sedley*, 1 Keble 620 (K.B. 1663).[9] Authorities generally agree that this was the first reported case involving obscene conduct.[10]

Whether the framers of the United States Constitution were influenced by the Common Law experience with the regulation of obscenity is, in our opinion, an unresolved issue. Mr. Justice Douglas suggests in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Commonwealth of Massachusetts* [hereinafter *Memoirs*], 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (Douglas, J., concurring), that the impact of the Common Law decisions was probably negative:

"[T]o assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, Freedom of the Press in the United States, 9 Publications Amer. Social. Soc. 67, 76."

Nevertheless, Justice Brennan, in *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), posits that the rejection of obsenity is "implicit in the history of the First Amendment . . . ." In our opinion, however, the historical narrative lends little forcefulness to Justice Brennan's opinion. Little consideration was given to the regulation of obscenity in colonial New England. In fact, the only colonial statute expressly mentioning the word "obscene" was a Massachusetts statute which prohibited "composing, writing, printing, or publishing . . . any filthy, obscene, or profane song, pamphlet, libel or mock sermon, in imitation of or in mimicking of preaching, or any other part of divine worship."[11] The

---

[9] Also reported as *LeRoy v. Sr. Charles Sidney*, 1 Sid. 168, pl. 29 (K.B. 1663). *See Technical Report of the Commission on Obscenity and Pornography* 67 (1970).

[10] Sir Charles Sedley, "as famous for his wit as he was for the profligacy of his life," *see Cambridge History of English Literature*, 158 (1912), became intoxicated at a tavern known as "The Cock" and climbed to a balcony overlooking Covent Garden, whereupon he removed his clothing and gave a speech, peppered with profanity, to the assembled onlookers. At the conclusion of his speech, Sir Charles poured urine from bottles upon the assembly below. The tavern was barricaded and Sir Charles rushed for cover as the populace attempted to storm the tavern. Sir Charles was fined for "showing himself naked on a balcony, and throwing down bottles (pist in) vi & armis among the people in the Covent Garden, contra pacem, and to the scandal of the Government." *See also Sir Charles Sydlyes Case*, 83 Eng.Rep. 1146-1147 (K.B. 1663); Alpert, *Judicial Censorship of Obscene Literature*, 52 Harv. L. Rev. 40 (1938).

[11] *See* Acts and Laws of the Province of Mass. Bay, c. CV, Sec. 8 (1712) in Mass. Bay Colony Charter & Laws 399 (1814); *see also United States v. 12 200-Ft. Reels of Super 8MM. Film*, 413 U.S. 123, 93 S.Ct. 2665 (1973) (Douglas, J., dissenting); *Technical Report of the Commission on Obscenity and Pornography*, 73-75 (1970).

regulatory context in which the word "obscene" appears in this statute casts it more as a blasphemy statute than as an obscenity statute. All other colonies left obscenity essentially unregulated, concentrating instead upon the offenses of blasphemy and libel.[12]

No obscenity decisions were reported during the colonial period, and the first case was in Pennsylvania in 1815.[13] Not until 1821 was a decision reported which involved obscene literature.[14] The same year, Vermont passed the first state law proscribing the publication or sale of "lewd or obscene" material.[15] Congress passed no legislation relating to obscenity until the middle of the nineteenth century.[16] The sketchy evidence leads us to conclude that the absolute rejection of obscenity is less than "implicit" in the history preceding the adoption of the First Amendment. *U. S. Const.* amend. I.

## II.
## POST-COLONIAL REGULATION OF OBSCENITY

Early obscenity laws were few in number, and few were brought before the courts until 1870, when federal and state governments, mainly due to the efforts of Anthony Comstock,[17] actively campaigned to suppress obscenity. *See Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).

In subsequent obscenity cases, the basic definition of "obscenity" which received virtually unanimous judicial acceptance until *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), was announced, was that formulated by the Court of Queens Bench in England in 1868, where Chief Justice Cockburn stated:
". . . I think the test of obscenity is this, whether the tendency of the matter charged as obscene is to deprave and corrupt those whose minds are open to such influences, and into whose hands a publication of this sort may fall." *Regina v. Hicklin,* L.R. 3 Q.B. 360 (1868).
The effect of the *Hicklin* test was to permit obscene material to be judged by the impact of isolated excerpts of material upon particularly sensitive persons. *See United States v. Kennerley,* 209 F. 119 (S.D.N.Y. 1913);

---

[12] *See Technical Report of the Commission on Obscenity and Pornography,* 74 (1970).

[13] *Commonwealth v. Sharpless,* 2 S. & R. 91 (Pa. 1815). This case involved an act of public indecency.

[14] *Commonwealth v. Holmes,* 17 Mass. 336 (1821). This decision involved the conviction obtained against a publisher of the novel, *Fanny Hill.*

[15] Laws of Vermont, 1824, c. XXXII, No. L, Sec. 23; *see also Technical Report of the Commission on Obscenity and Pornography,* 76 (1970).

[16] Tariff Act of 1842, c. 270, Sec. 28, 5 Stat. 566.

[17] Anthony Comstock, a clerk in a New York grocery store, devoted his spare time to tracking down sellers of obscene publications and seeking their prosecution under the New York Obscenity Statute. He joined forces with the Y.M.C.A. to work for national anti-obscenity legislation and was largely responsible for causing Congress to pass an Act governing the use of the mails to transport obscene material. 17 Stat. 599, 18 U.S.C. ch. 71, Sec. 1461. Comstock was then made special agent of the Post Office in charge of enforcing the new federal law. *See Technical Report of the Commission on Obscenity and Pornography,* 77-78 (1970).

*MacFadden v. United States*, 165 F. 51 (3d Cir. 1908); *United States v. Clarke*, 38 F. 500 (E.D. Mo. 1889); *Commonwealth v. Buckley*, 200 Mass. 346, 86 N.E. 910 (1909).

In *Roth v. United States, supra*, the United States Supreme Court expressly rejected the *Hicklin* test, stating that it was unconstitutionally restrictive of freedom of speech and the press. Strangely enough, this was the first time that the Supreme Court ruled directly on the question of whether obscenity was protected under the First Amendment of the United States Constitution. The Supreme Court, in *Roth*, refused to grant "obscenity" protection, asserting that it was "utterly without redeeming social importance," and measuring it according to the following standard: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

Subsequent cases elaborated upon the *Roth* standard, and eventually, the Supreme Court articulated three elements which must coalesce to establish that expression constituted obscenity:

(a) "The dominant theme of the material taken as a whole appeals to a prurient interest in sex;

(b) "The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and

(c) "The material is utterly without redeeming social value."

*See Memoirs, supra*. The Supreme Court, in *Memoirs*, clarified the meaning of the third part of the three-pronged definition of "obscenity," concluding that even though a book may be found to possess the requisite prurient appeal and be deemed to be patently offensive, it cannot be proscribed unless it is found to be *" 'utterly' without redeeming social value."* [Emphasis added.]

## III.
## THE NEW MILLER STANDARD

In *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973),[18] the Supreme Court reviewed a California statute which had been interpreted in light of the above-enumerated criteria. Mr. Chief Justice Burger, writing for the majority, reconsidered and repudiated the *Roth-Memoirs'* test:

" . . . . But now the 'Memoirs' test has been abandoned as unworkable by its author and no member of the Court today supports the 'Memoirs' formulation." *Miller v. California, supra.*

---

[18] *See also Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); *United States v. 12 200-Ft. Reels of Super 8MM. Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973). For an excellent analysis and discussion of these cases, *see* Sunderland, *Obscenity. The Court, The Congress and The President's Commission,* Domestic Affairs Study (1975).

The Supreme Court expressed its dissatisfaction with the third prong of the prior test, which:

" . . . called on the prosecution to prove a negative, i.e., that the material was 'utterly without redeeming social value' — a burden virtually impossible to discharge under our criminal standards of proof." *Miller v. California, supra.*

Acknowledging that the regulation of any form of expression was inherently dangerous, the Supreme Court, in *Miller*, required that "[s]tate statutes designed to regulate obscene materials must be carefully limited." The permissible scope of such regulation was confined to "works which depict or describe sexual conduct," and:

"[t]hat conduct must be specifically defined by the applicable state law, as written or authoritatively construed." *Miller v. California, supra.*

■ A new set of standards was then announced by the Supreme Court for the purpose of identifying obscene material:

(a) "Whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . . ;

(b) "Whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(c) "Whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value." *See Miller v. California, supra.*

The Supreme Court also attempted to clarify part (b) of the standards by adopting the catch-all term "hard core":

"Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed."

Unfortunately, the Supreme Court was less than munificent in giving state courts and legislatures examples of the kind of "hard core" pornography a state statute could lawfully regulate under part (b) of the enumerated standards. However, the following two examples were suggested by the Supreme Court in *Miller*:

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals."

The tools for precise analysis were further blunted by the Supreme Court's discussion of "community standards." Rejecting what it considered "hypothetical and unascertainable 'national standards,' '' the Court, in *Miller*, reasoned:

"It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City.

". . . . People in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity."

The Supreme Court offered no further guidance as to the boundaries of the more localized community under the new standards. Whether those boundaries are coexistent with those of the state, a county, or a municipality remains undecided by the Supreme Court. The problem with this approach is that in laying to rest the evanescent "national standard," the Supreme Court has expounded a new standard hardly less cryptic, and based upon the impulses of not one, but possibly thousands of undefined and illusive local communities. For the reasons stated in our companion case of *People v. Tabron,* 190 Colo. 161, 544 P.2d 380, we feel that nothing less than a state-wide standard is feasible in the interpretation of a state statute.

IV.

## THE COLORADO OBSCENITY STATUTE AND FEDERAL CONSTITUTIONAL STANDARDS

As intractable as the *Miller* standards are, we can at least conclude that the definition and regulation of obscenity under the Colorado Obscenity Statute, 1971 Perm. Supp., C.R.S. 1963, 40-7-101 (1) and 40-7-101 (2), and 1971 Perm. Supp., C.R.S. 1963, 40-7-102 (1), does not conform to the standards enunciated in the *Miller* opinion. The promotion of obscenity statute reads, in pertinent part:

"(1) A person commits promoting obscenity if he knowingly:

"(a) Promotes, or possesses with intent to promote, any obscene material; or

"(b) As owner, producer, director, manager, or performer, promotes any obscene performance or any portion of such a performance which contributes to the obscenity of the performance as a whole." 1971 Perm. Supp., C.R.S. 1963, 40-7-102 (1) (a) and 40-7-102 (1) (b).

The term "obscene" is defined in 1971 Perm. Supp., C.R.S. 1963, 40-7-101 (1) and further clarified in 1971 Perm. Supp., C.R.S. 1963, 40-7-101 (2). The sections which provide definitions state:

"(1) 'Obscene' means that which, considered as a whole, predominately appeals to prurient interest, i.e., a lustful or morbid interest in nudity, sex, sexual conduct, sexual excitement, excretion, sadism, masochism, or sado-masochistic abuse, and which goes substantially beyond customary limits of candor in describing, portraying, or dealing with such matters and is utterly without redeeming social value.

"(2) 'Predominant appeal,' 'customary limits of candor,' and 'redeeming social value' of a thing shall be judged by reference to the average adult in the community as a whole . . . ."

The most apparent defect in the above definition of "obscene" is that it incorporates the "utterly without redeeming social value" test of *Roth-Memoirs*, which was rejected in *Miller v. California, supra.* It has been

reasoned that material "utterly without redeeming social value" under the *Roth-Memoirs* test is necessarily lacking in "serious literary, artistic, political or scientific value" under the *Miller* test. *Commonwealth v. MacDonald,* 347 A.2d 290 (Pa. 1975). This court is not inclined to redraft a statute enacted by the legislature so as to insure its compliance with United States Supreme Court standards. In our opinion, the modifications in the law of obscenity occasioned by *Miller* "are so substantial that due process requires that a defendant receive prior notice thereof." *Detco, Inc. v. McCann,* 380 F.Supp. 1366 (E.D. Wis. 1974). The appellant was charged in this case with a crime that occurred prior to the Supreme Court decision in *Miller.*

"[T]o attempt to punish criminally pre-*Miller* conduct by a *new* post-*Miller* 'authoritative interpretation,' a new law so to speak, raises serious ex post facto questions of due process. See, e.g., James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961)." *State v. Shreveport News Agency, Inc.,* 287 So.2d 464 (La. 1974).

The appellant was entitled to a fair warning that his action, when committed, constituted a crime. To hold otherwise would deprive him of due process of law. *See Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

*Miller* also requires state statutes to specifically enumerate certain forms of sexual conduct, the description or depiction of which is to be prohibited. The two examples identified by *Miller* offer some guidance in our evaluation of the Colorado statute, and we reiterate both the examples and the Colorado statutory provisions for purposes of clarity and comparison.

The examples of permissible state regulation cited in *Miller* are:

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals."

In contrast, the Colorado statute, Section 40-7-101(1) provides:

"(1) 'Obscene' means that which, considered as a whole, predominately appeals to prurient interest, i.e., *a lustful or morbid interest in nudity, sex, sexual conduct, sexual excitement, excretion, sadism, masochism, or sado-masochistic abuse,* and which goes beyond customary limits of candor in describing, portraying, or dealing with such matters and is utterly without redeeming social value." [Emphasis added.]

■ The examples cited in *Miller* constitute an attempt by the Supreme Court to clarify part (b) of the *Miller* standards. That part is further explained as relating to materials which "depict or describe patently offensive 'hard-core' sexual conduct *specifically defined by the regulating state law* as written or construed."[19] [Emphasis added.] *See*

---

[19] To date, no authoritative construction has been imposed upon C.R.S. 1963, 40-7-101(1). Although we had occasion to consider the predecessor statute, C.R.S. 1963, 40-28-1, in *People v. Berger,* 185 Colo. 85, 521 P.2d 1244 (1974), that statute is not here in issue, and our full and express consideration was not given to the problem of "authoritative construction" in that case

*Miller v. California, supra.* Given their plain and ordinary meaning, the words "nudity, sex, sexual conduct, sexual excitement, . . . sadism, masochism, or sado-masochistic abuse," are not representative of the specificity contemplated by the Supreme Court in *Miller.* The Supreme Court has declared that to be obscene, " 'expression must be, in some significant way, erotic.'" *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (Brennan, J., dissenting); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The statutory definition of "obscene" in Colorado is drawn overly broad in that it obviously includes activities which could be described or depicted in some context other than an erotic one. In our opinion, the statute fails to describe an "ultimate sexual act," as suggested by *Miller,* and this lack of specificity renders the Colorado definition of obscenity constitutionally defective as measured by part (b) of the *Miller* standards. Where First Amendment freedoms are at stake, precision in drafting and clarity of purpose are priority considerations. *See Erznoznik v. City of Jacksonville, supra.*[20]

We are urged, implicitly, if not expressly, however, to authoritatively construe the Colorado statute so as to bring it into conformance with the *Miller* standards. In *United States v. 12 200-Ft. Reels of Super 8MM. Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), the Supreme Court expressed a willingness to construe federal legislation so as to achieve conformity with *Miller:*

"We further note that, while we must leave to state courts the construction of state legislation, we do have a duty to authoritatively construe federal statutes where" 'a serious doubt of constitutionality is raised' "and" 'a construction of the statute is fairly possible by which the question may be avoided.' "

" . . . . If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material . . . we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in Miller v. California, supra . . . ."

---

[20] We note additionally that the Miller standards require a finding that the work, "taken as a whole, appeals to the prurient interest." In contrast, 1971 Perm. Supp., C.R.S. 1963 40-7-101 (1), requires a finding that the work, "considered as a whole, predominately appeals to prurient interest . . . ." We deem this difference between the *Miller* standards and the statute to be so insignificant as to not merit discussion.

What the prosecution urges, under the guise of "authoritative construction," is a "wholesale rewriting" of the Colorado Obscenity Statutes. *See Commonwealth v. MacDonald, supra.* Such an approach was condemned by the Supreme Court of Tennessee in these words:

"The function of this Court is to interpret a statute against the constitution of this State and that of the United States and we will not and cannot usurp the prerogatives of the legislature by supplying essential elements to a statute which have been omitted by that body." *See Art Theater Guild, Inc. v. State ex rel. Rhodes,* 510 S.W.2d 258 (Tenn. 1974).

In declining to construe or judicially rewrite the Colorado statute so as to comply with *Miller,* we join the position of several other state courts that have addressed the same issue. *See Commonwealth v. MacDonald, supra; Art Theater Guild, Inc. v. State ex rel. Rhodes, supra; State v. Shreveport News Agency, supra; Commonwealth v. Horton,* 310 N.E. 2d 316 (Mass. 1973); *State v. Wedelstedt,* 213 N.W.2d 652 (Iowa 1973).

We deem it more important to adhere to well-founded principles of statutory construction, recognizing the fundamental constitutional doctrine of separation of powers, than to "defend the police power of the state by arbitrarily restricting the operation of the general words of our present statute." *State v. Little Art Corporation,* 191 Neb. 448, 215 N.W.2d 853 (1974). We, therefore, conclude that the Colorado statutes defining obscenity, 1971 Perm. Supp., C.R.S. 1963, 40-7-101 (1) and 40-7-101 (2), and prohibiting the promotion of obscenity, 1971 Perm. Supp., C.R.S. 1963, 40-7-102 (1), are unconstitutionally vague and overbroad, in violation of the First Amendment of the United States Constitution, as applied to the States through the Fourteenth Amendment. *See Miller v. California, supra.*

We find the statutes defining and regulating the promotion of obscenity in the State of Colorado to be unconstitutional under the First and Fourteenth Amendments to the United States Constitution and Article II, Section 10 of the Colorado Constitution.

Accordingly, we reverse and remand with directions to dismiss.

MR. CHIEF JUSTICE PRINGLE does not participate.