**SALT LAKE CITY, Plaintiff and Respondent,**

v.

**James D. PIEPENBURG, Defendant and Appellant.**

No. 14688.

Supreme Court of Utah.

Oct. 28, 1977.

Bruce C. Lubeck, John D. O'Connell, Salt Lake City, for defendant and appellant.

Roger F. Cutler, Salt Lake City Atty., Paul G. Maughan, Asst. Salt Lake City Atty., Salt Lake City, for plaintiff and respondent.

ELLETT, Chief Justice:

The appellant operates a film theatre and was charged with and convicted of the crime of exhibiting an obscene motion picture. The charge was made under a city ordinance and conviction had in the City Court. An appeal was then taken to the Third District Court where, upon a trial de novo, the appellant was again convicted. He now appeals to the Supreme Court of Utah where he makes a number of assignments of error, only one of which is cognizable on appeal, to wit: the validity of the ordinance under which he was tried and convicted.

The ordinance defines "obscene performance" as follows:

*Obscene performance* means a play, motion picture, dance, show or other presentation, whether pictured, animated or live, performed before an audience and which in whole or in part depicts or reveals nudity, sexual conduct, sexual excitement or sado-masochistic abuse, or which includes obscenities or explicit verbal description or narrative accounts of sexual conduct.

The motion picture exhibited revealed an entirely naked man and woman in various acts of sodomy (fellatio, cunnilingus, buggery) and adultery—all shown with closeup camera photography.

A more sickening, disgusting, depraved showing cannot be imagined. However, certain justices of the Supreme Court of the United States have said that before a matter can be held to be obscene, it must be ". . . when taken as a whole, lacks serious literary, artistic, political, or scientific value."

Some state judges, acting the part of sycophants, echo that doctrine. It would appear that such an argument ought only to be advanced by depraved, mentally deficient, mind-warped queers. Judges who seek to find technical excuses to permit such pictures to be shown under the pre-

tense of finding some intrinsic value to it are reminiscent of a dog that returns to his vomit in search of some morsel in the filth which may have some redeeming value to his own taste. If those judges have not the good sense and decency to resign from their positions as judges, they should be removed either by impeachment or by the vote of the decent people of their constituency.

The ordinance involved in this case is clear and no one can be in doubt as to its meaning. It proscribes the showing of explicit sexual intercourse and nudity. It is not overly broad, nor does it run counter to any constitutional prohibition. The ordinance is valid.

The appellant was found guilty on two separate trials: first, in the City Court and second, in the District Court. He cannot raise in this Court any claimed *errors* at trial. The District Court was his court of last resort for all asserted errors, save for the constitutionality of the ordinance. The rulings of that court are final as to other claimed errors. Article VIII, Section 9 of our Constitution provides:

> . . . Appeals shall also lie from the final judgment of justices of the peace in civil and criminal cases to the District Courts on both questions of law and fact, with such limitations and restrictions as shall be provided by law; and the decision of the District Courts on such appeals shall be final, except in cases involving the validity or constitutionality of a statute.[1]

The cases cited in footnote 1 below are to the effect that an appeal from a city court is the same as that from a justice of the peace court.

In searching for reasons to reverse the conviction of Mr. Piepenburg, the dissent attempts to find errors that the court of last resort found to be non-existent. If there is to be an appeal to a higher court for alleged errors in the trial of a misdemeanor case, it will have to go to the United States Supreme Court as the district court is, by our Constitution, the highest court in Utah to consider errors in such cases.

The dissent is rather long, but aside from being outside constitutional bounds, it is also not convincing in its reasoning. For instance, a great amount of space is devoted to the fact that the prosecuting attorneys, or some of them, inquired of neighbors and religious leaders as to whether the juror attended church. This is a smart move and a practice of all good lawyers. Each set of lawyers has some peremptory challenges for which they need give no reason. In trying to get a jury that will appreciate the claims to be made by a party to a lawsuit, the peremptory challenge should not be blindly taken. One can be sure that the defense attorney (if he was a good lawyer) would have made inquiry among the pimps, prostitutes, homosexuals, and other members of the pornographic community to see if any prospective jurors might be favorably inclined to protect one accused of showing pornographic films.

In this case, every man must choose which stance he wishes to take. As for me, I will enforce a valid ordinance and respect the judgment of the court of final authority as to all matters, save the invalidity of the ordinance.

The judgment of the district court, is therefore, affirmed and the case is remanded for the execution of the sentence heretofore imposed.

CROCKETT, Justice (concurring in result):

I concur in the holding that the ordinance is sufficiently clear and specific that per-

1. See also *State v. Robinson*, 23 Utah 2d 78, 457 P.2d 969 (1969); *Salt Lake City v. Peters*, 22 Utah 2d 127, 449 P.2d 652 (1969); *State v. Lyte*, 75 Utah 283, 284 P. 1006 (1930); *Logan City v. Blotter*, 75 Utah 272, 284 P. 333 (1929); *State v. Brown*, 75 Utah 37, 282 P. 785 (1928); *Salt Lake City v. Lee*, 49 Utah 197, 161 P. 926 (1916); *State v. Hoffman*, 91 Utah 462, 64 P.2d 615 (1937); *Bountiful v. Granato*, 77 Utah 133, 292 P. 205 (1930); *Salt Lake City v. Perkins*, 122 Utah 43, 245 P.2d 1176 (1952).

sons of ordinary intelligence, who desire to know what the law is, and to abide by it, would have no difficulty in understanding what is prohibited.[1] In doing so I add the following observations:

As indicated in our recent case of the same nature, *State v. Phillips,*[2] our own State Constitution, Article I, Section 1, has a better and broader statement concerning freedom of thought and expression than the First Amendment to the United States Constitution. Our section provides that:

> All men have the inherent and inalienable right . . . to communicate freely their thoughts and opinions . . .

Notwithstanding that desirable and salutary assurance, freedom of expression, just like all other freedoms, is subject to reasonable limitations where the protection of the public health, safety or morals so requires. Accordingly, even the most "liberal" and uninhibited concede that obscenity and pornography are subject to control by law.[3]

Whatever else may be said about any lack of certainty or other deficiency in the ordinance's defining of pornography, this defendant is in no position to complain thereof. There can be no question whatsoever but that any fair minded person with common sense would know and admit that the material published was obscene and pornographic. The mere fact that in the abstract the ordinance might adversely affect someone else in different circumstances does not redound to defendant's advantage.[4]

1. See *State v. Packard,* 122 Utah 369, 250 P.2d 561.

2. Utah, 540 P.2d 936; if it is the desire of the dissent to characterize this *Phillips* case, in fairness it should not be done by looking at one facet thereof. The case dealt with pornography. In regard to whatever application the First Amendment of the United States Constitution has to that issue, this writer stated, "What the claimed 'right' to spew the filth of pornographic and obscene materials on one's fellow man has to do with political and religious liberty is difficult to perceive." And further stated: ". . . we have no desire to disparage the idea that every person should have the highest possible degree of freedom of thought, expression and action consistent with

HALL, Justice (concurring in result):

In a case of this kind, oftentimes confusion arises as to the Court's appropriate role. It is not the Court's prerogative to give effect to our individual views on obscenity and pornography. Rather, it is incumbent upon us to determine what the Constitution allows.

I concur in the holding of constitutionality of the ordinance and that such is the only issue before the Court, despite the fact there is serious question as to defendant's standing before this Court. The concurring opinion of Justice Crockett aptly observes the defendant's lack of standing to assail the vagueness of the ordinance in light of his conviction of showing clearly obscene, pornographic material and I only wish to cite *State v. Tritt,* 23 Utah 2d 365, 463 P.2d 806 (1970) which supports the principle that even if a statute may be unconstitutional as applied to certain individuals or situations it will not be stricken down at the behest of one who is not adversely affected by the defect.

Irrespective of the foregoing, assuming defendant has proper standing to attack the ordinance, every presumption must be indulged in favor of constitutionality of the act and every reasonable doubt resolved in favor of its validity.[1]

Defendant's primary claim is that the ordinance is unconstitutionally vague and overbroad and that it fails to adhere to the standards set forth in *Miller v. California*[2] which are as follows:

> respecting similar rights in other individuals and the welfare of society generally." 540 P.2d at 939.

3. Ibid.: and see *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 and cases therein cited.

4. See 16 Am.Jur.2d, Const.Law, Sec. 119.

1. *State v. Packer,* 77 Utah 500, 297 P. 1013 (1931); *Broadbent v. Gibson,* 105 Utah 53, 140 P.2d 939 (1943).

2. 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards', would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

Defendant was convicted of violating Sec. 32–1–10(3) of the Revised Ordinances of Salt Lake City, 1965, which declares it unlawful to wilfully or knowingly to show a movie which "depicts or represents or describes obscene sexual conduct, an obscene performance or obscene sado-masochistic abuse or any obscenities for advertising purposes." Section 32–2–10.1 of said ordinance defines the terminology set forth therein and Section 32–2–10.1(14) provides:

(14) Obscene shall mean an act, depiction, representation, description, performance, or any other item, material or conduct in this chapter described, whether actual or simulated in form, which:

(a) Taken as a whole, the average person would find appeals to the prurient interest when applying contemporary community standards; and

(b) Depicts, describes or portrays sexual conduct, as defined in subparagraph (12) above, in a patently offensive way; and

(c) Taken as a whole, lacks serious literary, artistic, political or scientific value.

Defendant maintains the definitions are so broad as to render protected activity criminal. The difficulty with that position is that proper construction of such provisions requires that they be considered as a whole.[3]

When so viewed, the general thrust of the ordinance becomes readily apparent which is to prohibit the dissemination of "obscene" material and the limiting language, follows nearly verbatim the language of *Miller,* supra note 2. The definitive language necessarily must be read into all parts of the ordinance where the word "obscene" is used, and in doing so it adequately limits its application so as to meet constitutional safeguards.[4]

Defendant makes other constitutional challenges which should be met. His assertion that freedom of expression should be absolute was very adequately covered by Justice Crockett in his concurring opinion and indeed it must be subject to reasonable limitation; his assertion of violation of right of privacy fails by virtue of the fact that the movie was shown as a commercial venture which is clearly outside the scope of those truly private activities that warrant protection,[5] his assertion of violation of equal protection also fails since there is clearly a reasonable basis for treating law enforcement or educational institutions with bona fide pursuits and intentions differently than profit-making commercial ventures with unlawful pursuits and intentions. Such a classification is rationally related to a legitimate state and public interest and sustainable;[6] and finally, his assertion of a denial of trial by an impartial jury is clearly not reviewable here under case law[7] and the Utah Constitution,[8] because the district court is the court of last

3. *Buhler v. Stone,* Utah, 533 P.2d 292 (1975).

4. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

5. *U. S. v. Reidel,* 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971); *Paris Adult Theatre v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).

6. *State v. Packard,* 122 Utah 369, 250 P.2d 561 (1952); *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

7. *State v. Robinson,* 23 Utah 2d 78, 457 P.2d 969 (1969) and the numerous cases cited therein, followed recently by *Vernal City v. Critton,* Utah, 565 P.2d 408 (1977); *Salt Lake City v. Perkins,* 122 Utah 43, 245 P.2d 1176 (1952).

8. Article VIII, Section 9 providing for appeal from justice court to district court all decisions

resort on such appeals and this Court has no appellate jurisdiction.[9]

MAUGHAN, Justice (dissenting):

In a criminal proceeding in a city court defendant was charged with a violation of Section 32–2–10(3), Rev.Ord. of Salt Lake City (1975). Specifically, he was charged with exhibiting a motion picture depicting obscene sexual conduct. He was found guilty. He appealed to the district court. Upon a trial de novo, he was convicted by a jury. He appeals. We should reverse.

The reasons for reversal are many; they are fundamental to our jurisprudence. The infirmities are egregious.

Defendant waived any defense based upon artistic value; because he considered the prosecutorial misconduct, and the constitutional infirmities of the ordinance, to be of such magnitude as to require reversal. We should agree with both contentions.

First, I address the constitutional issue; then the prosecutorial misconduct giving rise to the claim of denial of an impartial jury.

It would appear the majority does not accord a First Amendment matter any greater strength than any other. If such is done under *State v. Phillips,*[1] where this Court said the First Amendment was nothing more than a limitation upon the Congress of the United States and the powers of the federal government; or under any other guise, I submit it cannot withstand analysis.

### The Constitutional Issue

Defendant urges throughout the proceedings the ordinance was facially unconstitutional on the ground of overbreadth. The trial court ruled that insofar as the ordinance conformed to *Miller v. California*[2] it was constitutional, and that the portion which did not so conform to those guidelines was unconstitutional. The court did not construe the ordinance, but denied defendant's motion, as it related to his case.

The ordinance declares: "It shall be unlawful for any person wilfully or knowingly to either:

(3) Import, write, compose, stereotype, print, design, copy, draw, paint or otherwise prepare, publish, sell, offer for sale, display, exhibit by machine or otherwise or distribute or furnish any writing, paper, book, picture, drawing, magazine, pamphlet, print, design, figure, still or motion picture, photograph or negative thereof, photocopy, engraving, sound recording, card, instrument or other such article which depicts or represents or describes obscene sexual conduct, an obscene performance, obscenities or obscene sado-masochistic abuse with the intent to distribute the same.

Section 32–2–10.1, provides:

*Definitions* as used in this chapter unless the context requires otherwise:

\* \* \* \* \* \*

(6) *Furnishes* means to sell, give, rent, loan or otherwise provide.

(7) *Nudity* means uncovered, or less than opaquely covered, human genitals, pubic areas, the human female breast below a point immediately above the top of the areola, or the covered human male genitals in a discernibly turgid state. For purposes of this definition, a female breast is considered uncovered if the nipple only or the nipple and areola only are covered.

(8) *Obscene performance* means a play, motion picture, dance, show or other presentation, whether pictured, animated or live, performed before an audience and which in whole or in part depicts or reveals nudity, sexual conduct, sexual excitement or sado-masochistic abuse, or which includes obscenities or explicit ver-

to be final, except cases involving the validity or constitutionality of a statute.

**9.** *State v. Brown,* 75 Utah 37, 282 P. 785 (1928); *Salt Lake City v. Lee,* 49 Utah 197, 161 P. 926 (1916).

**1.** Utah, 540 P.2d 936 (1975).

**2.** 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

bal description or narrative accounts of sexual conduct.

(9) *Obscenities* means those slang words currently generally rejected for regular use in mixed society, that are used to refer to genitals, female breasts, sexual conduct or excretory functions or products, either that have no other meaning or that in context are clearly used for their bodily, sexual or excretory meaning.

(10) *Sado-masochistic abuse* means flagellation or torture by or upon a person who is nude or clad in undergarments or in revealing or bizarre costume or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

(11) *Distribute* means to transfer possession of or permit to be viewed, heard or examined, with or without consideration.

(12) *Sexual conduct* means human masturbation, sexual intercourse or any touching of the covered or uncovered genitals, human female breast, pubic areas or buttocks of the human male or female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification, which term shall include, but not be limited to fellatio, cunnilingus, pederasty and bestiality.

(13) *Sexual excitement* means the condition of human male or female genitals or the breasts of the female when in a state of sexual stimulation, or the sensual experiences of humans engaging in or witnessing sexual conduct or nudity.

(14) *Obscene* shall mean an act, depiction, representation, description, performance, or any other item, material or conduct in this chapter described, whether actual or simulated in form, which:

(a) Taken as a whole, the average person would find appeals to the prurient interest when applying contemporary community standards; and

(b) Depicts, describes or portrays sexual conduct, as defined in subparagraph (12) above, in a patently offensive way; and

(c) Taken as a whole, lacks serious literary, artistic, political or scientific value.

(15) *Prurient interest* shall mean a shameful or morbid interest in nudity, sex, or excretion.

On appeal defendant contends the ordinance is unconstitutional on its face, in that it violates the First Amendment of the United States Constitution as applied to the States; through the Fourteenth Amendment. He urges he has standing to raise this constitutional issue under the doctrine of overbreadth, and that the ordinance in its present form cannot be limited by judicial construction so as to comply with the constitutional standard set forth by the United States Supreme Court.

When the government attempts to regulate expression, as here, rigorous constitutional standards apply. Where First Amendment freedoms are at stake the United States Supreme Court has repeatedly emphasized that precision of drafting and clarity of purpose are essential.[3] Therefore, in the First Amendment context, a person has standing to attack an overly broad statute, without demonstrating that, in fact, his specific conduct was protected.

The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. [Citations] The reason for the special rule in First Amendment cases is apparent: an overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute. [Citation] Indeed, such a person might choose not to speak because

**3.** *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 217–218, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted.[4]

In the First Amendment area, any enforcement of a statute placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.[5]

Defendant has standing to challenge the ordinance on First Amendment grounds as facially overbroad, whether or not his own activity is shown to be constitutionally privileged. Attacks on overly broad statutes are permitted with no requirement that the party demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.[6]

In an overbreadth analysis, the court should first delineate the constitutional bounds of protected and unprotected expression. Then it should be determined whether the challenged statute is facially overbroad. Finally, the question to be resolved is whether a limiting construction may be placed on the challenged statute to cure its constitutional infirmity.[7]

In *Miller*[8] the court reiterated that obscene material was unprotected by the First Amendment.

. . . We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited. [Citation] As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.[9]

Thus, in any attempt by the state to regulate obscene materials, any form of expression is protected under the First Amendment as applicable to the States through the Fourteenth Amendment, unless the material falls within the permissible scope of regulation as set forth in *Miller*.

Is the ordinance facially overbroad in that it attempts to regulate protected expression? A survey of the ordinance compels an affirmative answer.

The proscribed expression in subsection (3) includes all situations where there is an intent to distribute. In subsection 10.1(11) the term "distribute" is defined in all encompassing terms and extends beyond the scope of permissible regulation. The proscription against exhibition or distribution of obscene material is no where confined to local commerce and in places of public accommodation, but extends to all areas including the home and other places potentially within the protected zone of privacy.

In *Stanley v. Georgia*,[10] the court observed that the asserted governmental interest in dealing with the problem of obscenity cannot in every context be insulated from all constitutional protections. The government has an important interest in the regulation of *commercial distribution* of

---

4. *Bates v. State Bar of Arizona,* —— U.S. ——, ——, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977).

5. *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

6. *Bigelow v. Commonwealth of Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

7. *Hansen v. The People,* Colo., 548 P.2d 1278, 1280–1281 (1976).

8. Note 2 supra.

9. at pp. 23–24 of 413 U.S., at p. 2614 of 93 S.Ct.

10. 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

obscene material. On the other hand, the individual has the fundamental right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy, especially in the privacy of one's own home. Thus the mere categorization of material as obscene constitutes an insufficient justification for invasion of one's personal liberties guaranteed by the First and Fourteenth Amendments. The court stated:

> . . . Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. . . .[11]

Certainly, no one can take issue with that holding.

Throughout the majority opinion in *Miller,* the court emphasized that the permissible scope of state regulation encompasses commercial exposure, viz., sex or nudity may not be *exploited* by films or pictures exhibited or sold in places of public accommodation. The protection of the First Amendment does not extend to the *public* portrayal of hard core sexual conduct for its own sake and for the ensuing commercial gain. In its holding, the court stated:

> . . . We are satisfied that these specific prerequisites will provide fair notice to a dealer in such materials that his *public* and *commercial activities* may bring prosecution.[12] [Emphasis added.]

In *Paris Adult Theatre I v. Slaton,*[13] a companion case of *Miller,* the court emphasized that the states had a long-recognized legitimate interest in regulating the use of obscene materials in *local commerce* and *all places of public accommodation.* The court observed it was unavailing to compare a theater, open to the public for a fee, with the private home of *Stanley v. Georgia.* The court pointed out it had declined to

equate the privacy of the home relied on in *Stanley,* with a zone of privacy that follows a distributor, or consumer of obscene material, wherever he goes. In fact, the idea of right of privacy and a place of public accommodation are, in this context, mutually exclusive. The court ruled:

> . . . In this case we hold that the States have a legitimate interest in regulating commerce in obscene material and in regulating exhibition of obscene material in places of public accommodation, including so-called 'adult' theaters from which minors are excluded. . . .[14]

In this matter, the ordinance is overly broad in that the scope of regulation is not confined to commercial exploitation of depictions, descriptions, or exhibitions of obscene conduct on commercial premises open to the adult public.

The city urges that its definitions of "obscene" and "sexual conduct" comply with the constitutional standards set forth in *Miller.*

One of the requisite elements to constitute obscenity under the *Miller* standard is that the work depicts or describes in a patently offensive way sexual conduct specifically defined by applicable state law.[15] The court cited as examples the type of sexual conduct which the state could define for regulation.

> . . . (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
>
> (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibitions of genitals.[16]

In *Jenkins v. Georgia*[17] it was held that the foregoing examples, although they were not purported to be an exhaustive catalog of patently offensive sexual conduct, were

---

11. at p. 565 of 394 U.S., at p. 1248 of 89 S.Ct.

12. at p. 27 of 413 U.S., at p. 2616 of 93 S.Ct.

13. 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).

14. at p. 69 of 413 U.S., at p. 2642 of 93 S.Ct.

15. at p. 24 of 413 U.S., at p. 2615 of 93 S.Ct.

16. at p. 25 of 413 U.S., at p. 2615 of 93 S.Ct.

17. 418 U.S. 153, 160–161, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974).

intended to fix substantive constitutional limitations on the type of material subject to such a determination.

In reference to the examples set forth in *Miller,* the court said in *Hamling v. United States:* [18]

. . . While the particular descriptions there contained were not intended to be exhaustive, they clearly indicate that there is a limit beyond which neither legislative draftsmen nor juries may go in concluding that particular material is 'patently offensive' within the meaning of the obscenity test set forth in the *Miller* cases. . . .

The definitions of patently offensive sexual conduct in subsection 10.1(12) includes acts outside the substantive constitutional limitations as to the type of material which may be regulated. The touching of buttocks and breasts, covered or uncovered, although subjectively offensive to many, is not the type of "hard core" sexual conduct subject to state regulation under *Miller.* It should be acknowledged that there are included within the definition acts which are subject to regulation, but the subsection is overly broad and extends into areas of protected expression.

Subsection (3) of the ordinance further prohibits "obscene sexual performances," "obscenities," and "obscene sado-masochistic abuse."

The city has urged that the definition of "obscene" in subsection 10.1(14) would cure any constitutional infirmity in the definitions in 10.1(8), (9), (10).

Although "obscene" and "sado-masochistic abuse" are separately defined, the definitions of "obscene sexual performance" and "obscenities" are complete without any reference to the definition of "obscene." Furthermore, since the definition of "obscene" expressly includes as one of its elements "sexual conduct" as set forth in sub-

section 10.1(12), there would be a perplexing overlapping, which would cause confusion in any attempt at interpretation.

The proscription against an obscene performance includes any nudity. An ordinance of similar breadth was declared unconstitutional in *Erznoznik v. City of Jacksonville,* where the court said:

. . . The ordinance is not directed against sexually explicit nudity, nor is it otherwise limited. Rather, it sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness. . . [19]

Since the definitions under 10.1(8), (9), (10) attempt to proscribe conduct, which is not of the type subject to regulation under the *Miller* standard, they exceed the stringent constitutional limitations set forth.

Section 32–2–10.3, provides:

*Sole Trier.* The judge or the jury shall be the sole trier of what is obscene.

In *Miller v. California,* [20] the court stated the following as the basic guidelines for the trier of fact:

. . . (a) whether 'the average person, applying contemporary community standards' would find the work, taken as a whole, appeals to the prurient interest, [Citations] (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. . . .

Thus the trier of fact is permitted to determine certain facts concerning *elements* of obscenity, but whether material is "obscene" remains a question of law of constitutional magnitude.

In *Jenkins v. Georgia* [21] the state urged that the jury's verdict precluded review of

---

18. 418 U.S. 87, 114, 94 S.Ct. 2887, 2906, 41 L.Ed.2d 590 (1974).

19. 422 U.S. 205, 213, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (1975).

20. 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419.

21. 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974).

appellant's assertion that his exhibition of the film was protected by the First and Fourteenth Amendments.

The court responded:

> . . . . Even though questions of appeal to the 'prurient interest' or of patent offensiveness are 'essentially questions of fact,' it would be a serious misreading of *Miller* to conclude that juries have unbridled discretion in determining what is 'patently offensive.' Not only did we there say 'the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary,' 413 U.S., at 25, 93 S.Ct. 2615, but we made it plain that under that holding 'no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive "hard core" sexual conduct . . . .' Id., at 27, 93 S.Ct. 2607.

32–2–10.3 is unconstitutional as an attempt to preclude appellate review as to the ultimate issue of whether material is entitled to protection under the First And Fourteenth Amendments.

The foregoing analysis has attempted to illustrate, although not exhaustively, some of the provisions of the ordinance that are facially overbroad. May the ordinance, nevertheless, be so construed as to cure its constitutional infirmity? I do not think so.

The Colorado Supreme Court was confronted with a similar issue in *People v. Tabron.*[22] The court stated it was not inclined to redraft a statute enacted by the legislature to insure its compliance with United States Supreme Court standards. The court observed that what the prosecution urged under the guise of "authoritative construction" was, in fact, a "wholesale rewriting" of the Colorado Obscenity Statutes. It then said that the function of the court was to interpret a statute and that it

would not and could not usurp the prerogatives of the legislature by supplying essential elements which had been omitted by that body. It cited a number of other jurisdictions, wherein the courts had declined to construe or judicially rewrite their statutes so as to comply with *Miller.* It held:

> We deem it more important to adhere to well-founded principles of statutory construction, recognizing the fundamental doctrine of separation of powers, than 'to defend the police power of the state by arbitrarily restricting the operation of the general words of our present statute.' [Citation] . . .[23]

Another aspect which merits consideration is that the ordinance bears the date of 1975. *Miller* was decided June 21, 1973. The City had ample opportunity to draft an ordinance that fully complied with the *Miller* standards.

In *Hansen v. People,*[24] the court dealt with a section of the Criminal Code which the legislature had rewritten. The legislature had before it a proposal which would have brought the statute in full compliance with the constitutional mandate of the First and Fourteenth Amendments. The legislature omitted the essential language from the enactment. The court ruled that in view of the positive action by the legislature, the court was foreclosed from considering the application of a doctrine limiting construction of the statute.

The most important factor inhibiting this court from undertaking a comprehensive redrafting of the ordinance is the mandate of Article V, Section 1, Constitution of Utah.

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, *shall exercise any functions* appertaining to either of the others, ex-

---

**22.** Colo., 544 P.2d 372 (1976).

**23.** at pp. 379–380 of 544 P.2d

**24.** Colo., 548 P.2d 1278, 1281–1282 (1976).

cept in the cases herein expressly directed or permitted. [Emphasis suggested.]

This principle was applied recently in the case of *Salt Lake City v. I. A. of Firefighters.*[25]

Severability, where part of an act is unconstitutional, is primarily a matter of legislative intent. . . . where the provisions are interrelated, it is not within the scope of the court's function to select the valid portions of the act and make conjecture the legislature intended they should stand independent of the portions which are invalid.

*Salt Lake City* enacted a comprehensive statutory scheme setting forth certain conduct as criminal. The trial court conceded that many of the provisions in the ordinance were unconstitutional. Nevertheless, it ruled, without any attempt at making a definable limited construction, that a few kernels conceivably of constitutional character could be gleaned from the plethora of patently unconstitutional chaff. This ruling is contrary to Article V, Section 1 of our Constitution. It is not the function of the judiciary to engage in a selective process and speculate that the legislative body would have enacted the valid portions only, in an integrated and comprehensive enactment.

## Prosecutorial Misconduct

The actions accounting for this claim strike a bruising blow to a sine qua non of our system of jurisprudence. They were totally unnecessary, ill-conceived, misguided, and of such magnitude as. to require reversal. (See A. B. A. Standards, infra.)

Defendant contends he was denied a trial by an "impartial jury," as guaranteed by the Fourteenth Amendment of the Constitution of the United States, and Article I, Section 7 and Section 12, Constitution of Utah. His claim is predicated on prosecuto-

rial misconduct, which had the effect of subjecting the jury to outside influences.

The asserted prosecutorial misconduct is based on the actions of the then Deputy Attorney General, Robert Hansen, who associated with the city prosecutor in this case.[26] During the course of the trial, two jurors reported to the trial judge they had obtained information concerning a pretrial investigation of them conducted by the Attorney General's office.

Juror Pappas testified her neighbor informed her of a contact by the Attorney General's office. The neighbor was asked what kind of a person was Mrs. Pappas? Did she live alone? Did she go out and party a lot?

Juror Wardle testified that the ward[27] secretary (an officer in the ward of his church) was contacted and inquiry was made as to whether Mr. Wardle went to church; whether he was honest?

The interrogation of these two jurors was conducted in the court's chambers. No inquiry was made of these jurors as to whether their knowledge of this investigation would affect their verdict.

Attorney Hansen said concerning the background check of the jurors, that someone under his direction made inquiry in the neighborhood. He stated that if he or his associates did not know someone in the neighborhood of the individual on the jury list (which was the usual case), his office contacted the bishop of the ward (the highest ecclesiastical authority in that division). Mr. Hansen stated that in a large percentage of cases the bishops do not know the individual involved, but they do know someone who lives close by whom they could contact. Hansen explained the bishops were a source of information; and his method was simple and expedient, because of the church organization. Hansen did not

---

**25.** Utah, 563 P.2d 786, 791 (1977).

**26.** It should be here noted the City Prosecutor, Theodore Cannon, disclaimed any participation in the misconduct and intimated he did not want the association of the Deputy Attorney General in any future cases.

**27.** A ward is a small territorial division of the Church of Jesus Christ of Latter-Day Saints (Mormon) presided over by a bishopric. It is similar to the parish of other churches.

know if the bishop, in turn, contacted the individual.

The second allegation of misconduct was predicated on the basis of an interview given by Hansen, during the course of the trial, to a local television news station. Three of the jurors observed the entire program; two other jurors observed part of the event. All five of the jurors testified that the program would not affect their verdict. The trial court had not specifically admonished the jury not to read or watch any news concerning the trial, although the proceedings had generated local interest and were being covered by the news media.

A script of the broadcast was entered in evidence, the following are some of the pertinent portions:

> Recently the Utah Attorney General's office began lending assistance to city and county prosecutors in pornography cases. Part of that assistance included getting information about potential jurors.
>
> . . . The list of potential jurors became available late Friday, several members of the attorney general's office spent the weekend on the phone finding out whatever they could about them. Deputy Attorney General Robert Hansen directed the effort. Hansen says although the Mormon Church didn't participate, workers used the church (members) in getting the information. Bishops in the jurors' wards were called, and they, in turn, supplied other leads. The prosecutors were trying to learn if the jurors were pro or anti pornography.
>
> Hansen says the jurors themselves were never contacted by anyone, but when defense attorney O'Connell heard about it, he blew up. After conferences in Judge Peter Leary's chambers, and questioning of the jurors by Leary, he was satisfied the jury had not been tampered with. After the jury was selected this morning, Hansen felt pleased by the efforts. He said five of the jurors were

probably favorable to the prosecution, and two would probably hold out for a hung jury before they would acquit Piepenburg. . . .

Referring to this circumstance, the court later said:

> The Court: The only thing I can indicate to you is, No. 1, the Court is extremely concerned about the comments made to the news reporter from KUTV. No. 1, lawyers who are engaged in the trial don't go out and make those statements to people. . . .

Another circumstance, which must be considered in the evaluation of these events, was the fact that four of the eight jurors had read the articles in the local newspaper, sponsored by the Mormon Church, during an anti-pornography crusade. Seven of these articles, dating from January 17, 1976, to April 30, 1976, were entered in evidence. Defendant and his theater were mentioned in several. Opinions were expressed that organized crime and the Mafia reaped the profits from the pornographic trade. One article quoted a local leader as to the difficulty in prosecuting a case because the pornographers are represented by "$5,000 a day Mafia lawyers who have great skill."

One of the articles quoted the beloved and revered President of the L.D.S. Church:

> . . . We call upon all of our people to do all in their power to offset this ugly revolution.

> \* \* \* \* \* \*

> It is utterly without redeeming social value.

It was within the context of these circumstances, viz., the active leadership role of the L.D.S. Church to eradicate pornography, that Mr. Hansen utilized the organizational structure of the church to make a background check of the jurors.[28]

Defense counsel made a motion for mistrial on the ground of prosecutorial misconduct. One of the grounds asserted was the

---

**28.** I take no issue with the news media's First Amendment right to publish nor to the right of one to one's opinion. The facts are recounted to show the ambient atmosphere generated, and how it was used in relation to the jury trial.

method of pretrial investigation violated A.B.A. Standards of the Administration of Criminal Justice, Section 5.3(b), which provides:

In those cases where it appears necessary to conduct a pretrial investigation of the background of jurors the prosecutor should restrict himself to investigatory methods which will not harass or unduly embarrass potential jurors or invade their privacy and, whenever possible, he should restrict his investigation to records and sources of information already in existence.

Defense counsel urged that the contact with church personnel and neighbors constituted an invasion of privacy of the jurors. Defendant further stated that the television interview given by Hansen mentioned the church's involvement, and that of the Attorney General's office in the background check. Defendant contended the jury knew it was being watched. The jury knew inquiry had been made as to what kind of people they were, viz., did they party, were they moral? An outside influence had been exerted on the jury, e. g., they were made to feel that the authorities—governmental and ecclesiastical—expected moral church going people to arrive at a certain verdict. According to defendant, the jury might feel compelled to render a certain verdict, otherwise, they would have to explain how they as moral people had not ruled as expected. Defendant asserted he was entitled to a jury free from taint; which, of course, he was.

Of all our institutions the jury is the most democratic. To preserve its impartiality it must be free from outside influence. It must be independent. Here, the voluntary, and overt introduction into the process, of the pressure of government coupled with the force of ecclesiastical persuasion, renders the resulting situation intolerable; and constitutionally infirm.

The trial court said it was in a quandry because the jury, after trial had commenced, received information that inquiry had been made. The court characterized the problem as one of subtle persuasion,

whereby the jurors were advised that they were being watched.

At one point, in argument to the court, the prosecutor asserted the jury was not "tainted to the point where they can't render a fair and impartial judgment." The court responded:

The problem the court has in connection with it, it isn't tainted to a point, its "tainted."

Even so, the court later denied defendant's motion for a mistrial, saying there was no evidence that, because of the investigation the jurors decision would be influenced. A conjecture with which I cannot agree.

In the introduction to the Prosecution Function, A.B.A., Standards, the Administration of Criminal Justice, it is stated:

. . . Our nation began with resistance to oppressive official conduct and our traditions, embodied in the national and state constitutions, demand that the prosecutor accord basic fairness to all persons. Because of the power he wields, we impose on him a special duty to protect the innocent and to safeguard the rights guaranteed to all, including those who may be guilty. The conflicting demands on a prosecutor may exert pressures on him which his sense of fairness as a lawyer rejects. Both his public responsibilities as well as his obligations as a member of the bar require more than a partisan advocate intent on winning cases.[29]

It would appear here, the Deputy Attorney General should have bent his efforts to prevent such occurrences, rather than to voluntarily engage in them. As an officer of the court and counsel in the case he could well have taken counsel from Macbeth who when contemplating the murder of Duncan said:

First, as I am his kinsman and his subject
Strong both against the deed; then as his host,
Who should against his murderer shut the door,
Not bear the knife myself.

**29.** at pp. 77–78.

The introduction further states that at the appellate level, the sanction of reversal of convictions is the ultimate penalty against prosecutors.

The mandate of this Advisory Committee does not include the recommendation of sanctions to enforce the standards promulgated, but it cannot be too strongly emphasized that without a willingness of judges and the bar to assume the responsibility for enforcement, canons and codes of conduct and standards such as recommended in this and the other reports in the Project will remain hortatory. . .[30]

The conduct of Mr. Hansen was a flagrant violation of Standard Section 5.3(b). His statements and his methods were designed to harass and unduly embarrass potential jurors as well as to invade their privacy. If their verdict were not in the prosecution's favor, the message was clear—they would be branded by their neighbors and the members of the predominant religion of their neighborhoods as immoral, dishonest, pro-pornography, dissidents challenging the moral leadership of the community in its campaign against this "ugly revolution."

In *Murphy v. Florida*,[31] the court reiterated that the constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors.

In *State v. Brooks*,[32] this Court stated that "impartiality" is not a technical concept but is a state of mind; it is a mental attitude of appropriate indifference. Although factually different, the rationale of *Brooks* is applicable here. The law requires a juror to stand indifferent between the state and the accused. Although the juror is wholly sincere in his statement that his decision will not be affected by a personal relationship, it is difficult to accept, for it runs counter to human nature, and he cannot be deemed indifferent or impartial.

In *Sheppard v. Maxwell*,[33] the court observed that although in most cases involving claims of due process deprivations, they require a showing of identifiable prejudice to the accused; there are times a procedure employed by the state involves such a probability that prejudice will result that it is deemed inherently lacking in due process. ". . . 'our system of law has always endeavored to prevent even the probability of unfairness.' "

In *Sheppard* the court undertook an analysis of the totality of the circumstances. It observed the jurors were subjected to newspaper, radio, and television coverage of the trial. The trial court did not give the jurors adequate directions not to read or listen to anything concerning the case. The court noted the facts of record indicated a serious threat to the juror's privacy. Its observation was:

. . . Due process requires that the accused receive a trial by an impartial jury free from outside influences. . .[34]

The court admonished that appellate tribunals have the duty to make an independent evaluation of the circumstances. The court advised that if publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered.

. . . The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is

---

**30.** at p. 81.

**31.** 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

**32.** Utah, 563 P.2d 799, 801, 802 (1977).

**33.** 384 U.S. 333, 352, 86 S.Ct. 1507, 1517, 16 L.Ed.2d 600 (1966).

**34.** at p. 362 of 384 U.S., at p. 1522 of 86 S.Ct.

highly censurable and worthy of disciplinary measures.[35]

The city urges that it is a matter of discretion exercised by the trial judge as to whether a mistrial should be granted, and defendant has not shown an abuse thereof.

The court, upon a motion for mistrial, must weigh the danger of prejudice to the defense against the practicability of reducing or eliminating that danger by choosing a new jury. The essence of judicial discretion in dealing with misadventure is to so manage matters as to control the danger of jury prejudice to the extent practicable.[36]

Perfection in a court of law is unattainable, where a multitude of human factors are involved; and neither the state nor defendant is entitled to a perfect trial.

.  .  .  In so far as possible, however, both the State and the defendant are entitled to a fair and impartial jury. When events occur that cast an irrevocable cloud over the jury's fairness and impartiality, it is far better to grant the motion for a mistrial and start over again. The action should not be taken lightly, but when the interest of justice so demands, it should nevertheless be done.[37]

In *State v. Anderson*[38] this Court set forth the following test as to whether the accused had been denied a trial by an impartial jury as guaranteed by Article I, Section 12, Constitution of Utah:

.  .  .  Under [the] state of facts can it be said that appellant had the full benefit of trial by an impartial jury and one in no way influenced except by the evidence and the instructions of the court relative to the law applicable to the facts in the case?

In *Anderson* this Court observed that all authorities agree that any conduct or relationship between a juror and a party to an action during trial that would or might,

*consciously* or *unconsciously*, tend to influence the judgment of the juror authorizes and requires the granting of a new trial, unless there is affirmative proof that the judgment of the juror was in no way affected.

After a review of the record of this case, the conclusion is compelling that defendant was denied his constitutional right to be tried by an impartial jury.

The City urges that under Article VIII, Section 9, Constitution of Utah, the asserted denial of defendant's right to be tried by an impartial jury cannot be reviewed by this Court, since it does not involve the validity or constitutionality of a statute or ordinance.

The dissent of Justice Crockett in *State v. Robinson*[39] is applicable here:

.  .  .  When a case is before this court on a proper constitutional ground, the court should review whatever other assignments of error it thinks the interest of justice requires.  .  .  .

This case is here on a proper constitutional ground.

The interpretation urged by the City creates a hiatus in the judicial process, for there would be no means through the appellate structure of our judicial system to correct prejudicial error committed by a trial court in its proceedings.

Furthermore, if the finality of judgment provision of Article VIII, Section 9, is construed literally, as urged by the City, there emerges in this case a strong conflict with Article I, Sections 3, 7, 12, Constitution of Utah.

Article I, Section 3, provides:

The State of Utah is an inseparable part of the Federal Union and *the Constitution of the United States is the supreme law of the land.* [Emphasis added.]

---

**35.** at p. 363 of 384 U.S., at p. 1522 of 86 S.Ct.

**36.** *People v. Thomas*, 47 Cal.App.3d 178, 120 Cal.Rptr. 637 (1975).

**37.** *State v. Reynolds*, 11 Ariz.App. 532, 466 P.2d 405, 408 (1970).

**38.** 65 Utah 415, 419, 237 P. 941, 943 (1925).

**39.** 23 Utah 2d 78, 83, 457 P.2d 969, 972 (1969).

When a serious deprivation of a fundamental right guaranteed not only by the State Constitution, but by the Constitution of the United States, is presented to this Court, the strictures (if such they are here) of Section 9, Article VIII are not applicable. A violation of due process in a de novo proceeding before the district court has the same magnitude of constitutional infirmity as the invalidity of an ordinance or statute, the review of which is permitted.[40]

Aside from the foregoing reasons to entertain the appeal; in my view, we need look no further than our constitution and statutes, in aid thereof, to see the appeal is properly before us. Let us look first to Article VIII, Section 9.

In that section there is given the right of appeal from all final judgments of the district courts; from final orders and decrees of the Court in the administration of decedents estates, and in cases of guardianship; from the final judgment of justices of the peace:

> . . . in civil and criminal cases to the District Courts on both questions of law and fact, with such limitations and restrictions as shall be provided by law; and the decision of the District Courts on such appeals shall be final, except in cases involving the validity or constitutionality of a statute.

The section describes the appeal to be had. To wit, the appeal shall be on the record made in the court below, and under such regulations as may be provided by law. In equity cases the appeal may be on both questions of law and fact; in law cases on questions of law alone.

This section contemplated the courts inferior to the District Courts would be courts of record. The section requires the appeal to be on the record made in the court below. How else could one present an appeal on questions of law and fact?

When this state elected not to make such inferior courts, courts of record, it provided a trial de novo:[41] There is no mention of a trial de novo in Article VIII, Section 9. The trial de novo pursuant to the practice prevailing in this state for City Courts is now found in our 78–4–17, U.C.A.1953. See *Baker v. Department of Registration*, 78 Utah 424, 440, 3 P.2d 1082 (1931).

That statute originally appeared as Chapter 109, Section 18, Laws of Utah 1901, and its significant provisions have remained unchanged, through several amendments and reenactments. These statutes removed the hiatus created when courts inferior to the District Courts were not made courts of record. One such significant provision is:

> From all final judgments of a city court a motion for a new trial may be made, and on appeal may be taken . . . to the district court . . . and from all final judgments in the district courts rendered upon such appeals, an appeal may be taken to the supreme court in like manner as if said actions were originally commenced in the district court [there follows the $100 limitation] . . . that in all cases involving the validity or constitutionality of the statute, there shall be a right of appeal to the supreme court.

This seems to clearly say that whether the amount in controversy is less than $100; or not, an appeal lies, if validity or constitu-

---

**40.** There is no doubt in my mind this Court can review errors in a de novo proceeding before the district court. Article VIII, Sec. 7, describes the jurisdiction of the district court as "appellate jurisdiction from all inferior courts and tribunals." In contrast, the limitation of Article VIII, Sec. 9, is expressly limited to "justices of the peace." The distinction in language was certainly used advisedly by the framers of the Constitution. Article VIII, Sec. 8, provides that the legislature may restrict the jurisdiction of the justices of the peace. Article VIII, Sec. 1, permits the establishment by law of other courts inferior to the Supreme Court. It can be argued that the framers contemplated the establishment of other courts, inferior to the district court and subject to its appellate jurisdiction, but with a much broader jurisdiction than the justices of the peace. If the element of finality were indeed literally intended to be applied to "all inferior courts and tribunals," it is inexplicable why this phraseology was not repeated in Sec. 9 rather than "justices of the peace."

**41.** 77–57–43, U.C.A.1953.

tionality is an issue; and in any event in criminal cases.

A trial de novo is not an appeal. Hence, the statutory provision to provide one to the supreme court "in like manner as if said actions were originally commenced in the district court; . . .." Otherwise, the only entity able to review the performance of the district court is the district court itself. It makes the only record which can be reviewed. To allow it to sit in judgment of its own performance is not consonant with our law, as it is written, or proclaimed.[42]

In my view, this Court has consistently misconstrued Article VIII, Section 9, while paying little heed to 78–4–17, and its predecessors.

An illuminating case is that of *State v. Lyte*.[43] There defendant resisted a motion to dismiss made by the state, pursuant to the finality of the judgment of the district court under Article VIII, Section 9. Defendant contended that at his trial de novo in the district court, his guaranteed constitutional right not to be twice put in jeopardy for the same offense was denied and invaded. Defendant argued that although his appeal did not involve any question as to the validity of a statute or ordinance, this Court, in the exercise of its inherent power, was authorized to redress wrongs and to grant relief where the rulings of the district court deprived him of a right guaranteed under the Constitution, viz., the right not to be put twice in jeopardy.

This Court responded:

. . . If therefore the rulings complained of do not involve jeopardy, there is no necessity to here consider our power, in such a case as now before us— where the judgment of the district court is final and nonappealable—to grant relief when constitutional rights in such particular are invaded. . . .

In *Lyte*, this Court recognized there were situations wherein it had the power to interfere with a *final* judgment from the district court under Article VIII, Section 9.

This power is analogous to the matters reviewed under a petition for a writ of habeas corpus, viz., where one is restrained of his liberty where there existed no jurisdiction or authority, or where the requirements of the law have been so ignored or distorted that the party is substantially and effectively denied what is included in the term due process of law.[44]

Whether the statements in *Lyte* be deemed either an express or implied statement of the power of this Court to review a *final* judgment of the district court, where it is asserted a constitutional right has been denied in the proceedings of the trial de novo, there is no basis to assert there has been a long established precedent in this Court to deny review under this circumstance. Furthermore, it would be an anomalous situation to inform a defendant that the judgment as to him was final and he must resort to an extraordinary writ to assert a serious and flagrant denial of rights guaranteed him under the due process clause of the state and federal constitutions.

WILKINS, Justice (concurring with comments to Justice Maughan's dissenting opinion.):

I concur with Justice Maughan that the unconstitutionality of the ordinance and prosecutorial misconduct warrant a reversal in this case and make these comments.

The fact that the film in this case would probably be considered revolting trash to a large number of people in no way removes the need to have the matters of misconduct and unconstitutionality meaningfully addressed—and resolved against the plaintiff because they are, I respectfully submit, meritorious.

42. See: *Schramm-Johnson Drugs v. Kleeb et al.*, 51 Utah 159, 164, 169 P. 161 (1917), and *Moss v. Taylor*, 73 Utah 277, 289, 273 P. 515 (1929).

43. 75 Utah 283, 284 P. 1006 (1930).

44. *Gallegos v. Turner*, 17 Utah 2d 273, 409 P.2d 386 (1965); *Bryant v. Turner*, 19 Utah 2d 284, 431 P.2d 121 (1976).

Pornography has been and can be successfully prosecuted by conduct which comports with traditionally established rules and under properly drawn ordinances and statutes, but aversion to pornography must not become an instrument to mar our legal system's commitment to a fair trial.

In many trials, civil and criminal, the controversy involves distress, dishonesty, brutality, filth, violence—involves indeed all types of ugly and unpleasant matters. But our system's commitment does not permit imposition of sanctions against even the "hated and despicable" without observing the proper legal processes and standards.

And I do not think that our legal system, which requires these standards, promotes technical nonsense or results in vast futility. It rather aids and solves—in this imperfect world—more than it hinders or fails.